**UNITED STATES v. SMYTH et al.**

**UNITED STATES v. DOYLE et al.**

Nos. 33092–33095.

United States District Court. N. D. California, S. D.

Feb. 20, 1952.

See also 104 F.Supp. 279, 104 F.Supp. 309.

**26.** Judge Learned Hand, in United States v. Garsson, D.C., 291 F. 646, 649.

Chauncey Tramutolo, U. S. Atty., Robert B. McMillan, Asst. U. S. Atty., Macklin Fleming, Asst. U. S. Atty., all of San Francisco, Cal., Irvin Goldstein, Special Asst. to the U. S. Atty. Gen., for plaintiff.

Harold C. Faulkner (of Melvin, Faulkner, Sheehan & Wiseman), and Joseph L. Alioto, all of San Francisco, Cal., for defendants.

JAMES ALGER FEE, Chief Judge of the District of Oregon, sitting by special assignment.

■ There have been presented to the court by defendants in these cases multitudinous questions regarding the law and practice relative to grand juries. The prevalent confusion[1] and doubt in the lay mind and even in the minds of lawyers impels the court, in disposing of these motions, to write an authoritative exposition. Only thus can confidence in representative government be restored.

There has been biting criticism of our fundamental structures of freedom in the last three decades. Much of this has been from high-minded persons, perhaps without great practical experience, who were actuated by a desire for relief of shackles of archaic custom or economic convention, but, on the other hand, much has been motivated by a desire to destroy our essential institutions. At times, this criticism has even affected responsible judicial opinion. The result has been confusion.

It is the purpose of this opinion to give a clear an decisive statement of the powers and duties of the grand jury which will return to the touchstone of fundamentals[2] and give a definite guide for the future.

1. Much of the confusion in the Northern District of California is caused by a charge to the grand jury delivered by Justice Field here in 1872. It is much cited because of an excellent thumbnail sketch of the origin and development of the grand jury. However, a caution therein contained to prevent a recurrence of investigations based upon malicious and unfounded statements from private persons in California has been adopted by some courts as a precedent. The Supreme Court of the United States, while quoting sound portions of the Field charge, distinctly repudiated the view that the grand jury could not start an independent investigation and the view that the court could circumscribe their field of investigation. In Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, the court specifically rejected such portions of the Field charge and established the theses (1) that the grand jury is empowered to investigate a matter submitted by the court or the United States Attorney, (2) that the grand jury has authority to investigate a field of fact with no defendant or criminal charge specifically in view, and (3) that the grand jury may seek information anywhere although they may only indict on competent evidence. So far as the Field charge conflicts with these axioms, it is not law and constitutes no precedent for this District.

2. "Inasmuch as the initiation of prosecution through grand juries forms a vital feature of the federal system of criminal justice, the law governing its procedures and the appropriate considerations for determining the legality of its actions are matters of first importance." United States v. Johnson, 319 U.S. 503, 507, 63 S.Ct. 1233, 1235, 87 L.Ed. 1546.

A highly authoritative exposition of the principle and evolution of a grand jury with reference to its present uses is found in Orfield, Criminal Procedure from Arrest to Appeal, pp. 135–193, with an introduction by Chief Justice Arthur Vanderbilt in Judicial Administration Series.

The American Law Institute promulgated a code of criminal procedure in 1930–31, the commentaries to which are especially valuable. The Federal Rules of Criminal Procedure restate in general the practice of the United States courts, but the authoritative pronouncements binding upon the federal court in adapting the historical common law grand jury to conditions in this country are found in a series of opinions of the Supreme Court of the United States. These are not all squarely in point as to the problems here presented, but are highly illuminative. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; Hendricks v. United States, 223 U.S. 178, 32 S.Ct. 313, 56 L.Ed. 394; Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979; United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333; Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783; United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546.

Sound discussions are found in In re Grand Jury Proceedings, D.C.E.D.Pa., 4 F.Supp. 283 (Kirkpatrick); United States v. Central Supply Association, D.C.N.D.Ohio, 34 F.Supp. 241 (Wilkin).

No attempt will be made to give a general bibliography, but the following texts are of great value. Somers, The Security of Englishmen's Lives or The Trust, Power and Duty of the Grand Juries of England, London, 1682; Holdsworth, A History of the English Law; Pollock and Maitland, History of the English Law; Stephen, History of the Criminal Law of England; Alice Stopford Green, Henry II; Kinghorn, Growth of the Grand

The institution of the grand jury is a development which comes to us out of the mists of early English history. It has undergone changes, but has been remarkably stable because the institution has been molded into an instrument of democratic government, extraordinarily efficient for reflecting not the desires or whims of any official or of any class or party, but the deep feeling of the people. As such, with its essential elements of plenary power to investigate and secrecy of its deliberations, it was preserved by the Constitution of the United States [3] not only to protect the defendant [4] but to permit public spirited citizens, chosen by democratic procedures, to attack corrupt conditions.[5] A criticism of the action of the grand jury is a criticism of democracy itself.

The inception of the "grand inquest" [6] is shrouded in the early reaches of English history. It was a device whereby originally, when first authoritatively noticed c. 1166,[7] the Norman kings of England required answers from representatives of local units of government [8] concerning royal property and franchises [9] and also enforced communal responsibility for the acts of criminals.[10] By gradations, the grand juries gave voice to the fama publica

Jury System, 6 Law Mag. and Rev. (4th S.) 375; Forsyth, Trial by Jury; Thayer, Preliminary Treatise on Evidence at Common Law; Willoughby, Principles of Judicial Administration.

The instant situation has caused considerable research. Stanford Law Review, Vol. 4, No. 1, pp. 68, 78 (December, 1951), Powers of Federal Grand Juries; California Law Review, Vol. 39, No. 4, pp. 573, 579 (December, 1951), Student Note, Criminal Law, Powers of Federal Grand Juries. Professor Augustin Derby, of Hastings College of the Law, address December 4, 1951, before Blackstone Post, The American Legion, The San Francisco Recorder, December 5, 6, 7, 10 and 11, 1951.

3. Amendment V, Constitution of the United States.

4. " * * * the most valuable function of the grand jury was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, * * *." Hale v. Henkel, 201 U.S. 43, 59, 26 S.Ct. 370, 373, 50 L.Ed. 652.

5. "It seems likely that the cases originated by the grand jury are those which can be best investigated by the secret procedure of a grand jury hearing prior to arrest. That is to say, cases originate with the grand jury where the local authorities and the prosecutor refuse to act." Orfield, 135.

"In cases which involve large scale criminal activity, or in other instances in which public officers may be subject to powerful pressures, the nonpolitical grand jury can do much to protect the public interest." 4 Stanford Law Review, 78.

Willoughby, 193–194.

6. Kinghorn, 367. Also called "Assize." Thayer, Evidence, 57–58.

7. "The consecutive history of the grand jury goes back to the assize of Clarendon, issued by Henry II in 1166". Orfield, 137. According to this assize, "The accusation was to be made by 'juries' composed of twelve men of the hundred and four men of the township; the presentment of a criminal by a jury such as this practically implied that the man was held guilty by the public report of his own neighborhood." Green, Henry II. In c. vi of the Constitutions of Clarendon, in 1164, a jury of accusation is provided for—"faciet jurare duodecim legales homines de vicineto * * * quod inde veritatem secundum conscientiam suam manifestabunt."

8. The same machinery used for the grand jury was that employed by the Conqueror when the Doomsday Book was to be made. 2 Pol. & M., 642.

9. "Among the miscellaneous mass of presentments that they make about * * * purprestures, about the usurpation of franchises and so forth, there will usually be a few * * * which we can call indictments for felony * * *." 2 Pol. & M., 647.

10. See Stephen, 185–190, 251–252.

The power to inquire by a grand jury, which dates back to 1166, was originally "a power to compel the grand jury to disclose those who were suspected of grave criminal offenses." 38 Columbia Law Review, 1493, 1496.

"So long as the view of frank pledge was observed, there was a public provision for bringing every wrongdoer to justice." But this developed into the grand jury. Kinghorn, 368.

of the locale [11] as to crimes, and were later recognized in the character of witnesses.[12] Through hundreds of years, these characteristics remain inherent. In an early stage of evolution, the body made presentment or presented indictments at the behest of private individuals [13] or the Prosecutor for the King.[14] Vestiges of all these factors still subsist.

The institution was thus evolved as an instrument for efficient prosecution of crime, and as such it has remained until this day. The principle of secrecy was developed to protect the King's Counsel and to permit the Prosecutors to have influence with the grand jury,[15] and in modern times it is still useful for the same purpose. By degrees the secrecy of proceedings permitted two outstanding extensions in that grand jurors at times refused to indict notwithstanding pressure from the Crown and the judges.[16] This prerogative stood the people well in hand during the tyranny of the Stuarts,[17] and, as it was eulogized by

11. "From the very first the legal forefathers of our grand jurors are not in the majority of cases supposed to be reporting crimes that they have witnessed, or even to be the originators of the fama publica." 2 Pol. & M., 643.

"The ancestors of our 'grand jurors' are from the first neither exactly accusers nor exactly witnesses. They are to give voice to common repute." 2 Pol. & M., 642.

"But sometimes one is accused by 'public fame', i. e., the accusing jury." Thayer, 65. Long before Edward I, if a defendant be accused by the jury, "They have not sworn that he is guilty, they have not even sworn that they suspect him, they have only sworn that he is suspected (rettatus, malecreditus)." 2 Pol. & M., 648.

See also 1 Pol. & M., 120; Thayer, 47–54; 1 Holdsworth, 312–313.

12. Referring to the trial jury, which sprang from the same root, "In England, on the other hand, the witnesses must be twelve; they are chosen by a public official of high standing acting under oath, from among persons of the neighborhood where the matter in question is supposed to exist or take place, men of property, indifferent between the parties, subject to challenge by both, acting under oath." Thayer, 130–131. A résumé of Fortescue, "De Laudibus Legum Angliae," written before 1470, where the jurors are described as "Iste Testes." Thayer, 132, also says: "In this account, it is obvious how great a figure that old quality of the jury still plays which made them witnesses."

13. "Anyone, however, may appear before them with a bill or a draft indictment and witnesses to prove its truth." 1 Stephen 293. 2 Russell, 1778.

14. "The first notices of Crimes or suspicions of the Criminals by whomsoever brought in and the intentions of searching them out, and prosecuting them legally are called the King's Counsel, because the principal care of executing Justice is entrusted to him, and they are to be prosecuted at his Suit, and in his name; and such proceedings are called Pleas of the Crown." Somers, 42.

15. "The object of this secrecy was * * * to prevent his getting knowledge of the fact and making his escape." Kinghorn, 371.

"Certainly, this Duty of secrecie concerning the Kings Counsel was imposed upon the Grand Inquest with great reason, in order to the publick good. * * * to make effectual Enquiries after Criminals to offer them to Justice." Somers, 44

16. Punishing grand jurors for refusal to follow wishes of the justice was brought to an end "by the resolute action of Sir Hugh Windham (King vs. Windham, 2 Keble 180). In this case the grand jurors refused to find a bill for murder. * * * The chief justice thereupon fined eleven of them, among whom was 'Sir Hugh Windham, and bound them over until the King's Bench should determine the matter. The court relieved them of the fine." The chief justice was afterward accused in Parliament by Sir Hugh Windham and was obliged to acknowledge that the finding was unlawful. Edwards, The Grand Jury (1906) 164 ff.

17. "The three centuries that followed * * * witnesses its [grand jury's] freedom of action from all restraint by the court. The independence which the institution had attained was soon put to the severest tests, but protected by the cloak of secrecy and from the control of the court as to their findings, they successfully thwarted the unjust designs of the government.

"It was in the reign of Charles the Second that we find the two most celebrated instances of the fearless action of the grand jury in defending the liberty of

Coke and Blackstone, the institution was encysted with all its characteristics in the Fifth Amendment.[18] But the grand jurors, by use of secrecy of their proceedings, stubbornly retained the power of instituting an investigation of their own knowledge or taking a rumor or suspicion and expanding it through witnesses.[19] As we shall see, this comprehensive power also remains at this hour.[20] The Constitution of the United States preserved the grand jury with all its powers and inherent character.[21] Notwithstanding the criticisms of Bentham and the ultramodern pseudo Benthamites, the grand jury is an essential element in the structure of the federal government now. No other instrument can cope with organized crime which cuts across state lines,[22] conspiracies to overthrow the government of the United States, or alleged deviations from rectitude by those who have been entrusted by the government with public trust.[23] Even the most virulent

the subject, although subjected to the strongest possible pressure from the Crown. In 1681 a bill of indictment for high treason against Stephen College, the protestant joiner was submitted to a grand jury in the City of London. Lord Chief Justice North compelled the grand jury to hear the evidence in open court and of the witnesses produced it was said, 'It is certainly true that never men swore more firmly in court than they did.' The grand jury demanded that the witnesses be sent to them that they might examine them privately and apart, which the court permitted to be done. After considering the matter for several hours, the grand jury ignored the bill. Upon being asked by the Lord Chief Justice whether they would give a reason for this verdict, they replied that they had given their verdict according to their consciences and would stand by it. * * *

"In the same year an attempt was made to indict the Earl of Shaftesbury for high treason. (8 How.St.Tr. 775). * * * after * * * hearing the witnesses and considering their verdict, they returned the bill 'ignoramus'. * * * This case is perhaps pointed out more often than any other as an instance of the independent action of the grand jury." Edwards, 28–29.

See Hallam's Constitutional History of England, Vol. II, p. 202 ff.

Thayer, 181, says that the grand jury in criminal cases kept up the older methods of procedure and heard the witnesses "privately and without judicial supervision," remarking that in Shaftesbury's case it was only by determined resistance that the grand jury retained this power.

18. "The Constitution itself makes the grand jury part of the judicial process. It must initiate prosecution for the most important federal crimes." Cobbledick v. United States, 309 U.S. 323, 327, 60 S.Ct. 540, 542, 84 L.Ed. 783.

19. After the assize of Clarendon, "These juries could present either from their own knowledge or from the information of others, just as at the present day the grand jury may present matters which they themselves have observed or, as is more usual, may endorse the indictments or accusations made by others." 1 Holdsworth, 321.

"Nor are the Jury tied up to inquire only of such crimes as the Judges shall think fit to give them directly in charge, much less of such bills only as shall be offered to them; but their inquiry ought to extend to All other Matters and Things which shall come to their Knowledge, * * *" Somers, 34.

20. See United States v. McGovern, D.C., 1 F.Supp. 568.

"It is invested with broad investigatorial powers into what may be found to be offenses against federal criminal law. Its work is not circumscribed by the technical requirements governing the ascertainment of guilt once it has made the charges that culminate its inquiries." United States v. Johnson, 319 U.S. 503, 510, 63 S.Ct. 1233, 1237, 87 L.Ed. 1546.

21. See the discussion of the preservation of the grand jury by the constitutional guarantee in Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849.

"The Fifth Amendment and the statutes relative to the organization of grand juries recognize such a jury as being possessed of the same powers that pertained to its British prototype, * * *." Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979.

22. Judge Kirkpatrick says, "As an engine of discovery against organized and far-reaching crime, it has no counterpart." In re Grand Jury Proceedings, D.C., 4 F.Supp. 283, 284.

23. "Unlike a committing magistrate under one of the prevailing types of information system, a grand jury is amply endowed with legal power for the exercise of its function as a lay leaven of bureaucracy, a check on corruption, and in gen-

critics are unanimously in accord that the grand juries must be preserved in the federal system for these purposes.[24]

The grand jury breathes the spirit of a community into the enforcement of law.[25] Its effect as an institution for investigation of all, no matter how highly placed, creates the elan of democracy.[26] Here the people speak through their chosen representatives.[27] This feature has been largely disregarded by the critics. But it is the essence of the rule of the people.[28] The

grand jurors may commit serious errors. But the voters are not deprived of suffrage because of occasional mischances.

■ The grand jury is an arm or agency of the court by which it is appointed. The grand jurors are officers of the court. The United States Attorney,[29] his assistants, the United States Marshal and his deputies and bailiffs, appointed by him to guard their deliberations, and, modernly, the reporters who record their proceedings are likewise officers of the

eral a citizens agency for overseeing and controlling the initiatory activities of the prosecution." Dession, From Indictment to Information—Implications of the Shift, 42 Yale Law Journal 163, 176.

"It is highly desirable that it should be continued as a citizen agency for the exercise of general inquisitorial powers in respect to social conditions and the conduct of public officers." Willoughby, 194.

"It is well suited to investigate riots and public disorders of a like nature, corruption in office, certain extensive conspiracies, and cases with religious and racial aspects which ought to be conducted in a manner beyond suspicion of prejudice." Orfield, 187.

24. "There are some cases in which a body of representative men, drawn from the county as a whole, may be better fitted to act than a prosecuting officer or the court itself; * * *" W. F. Dodd, State Government, 312, quoted by Willoughby, 182.

"* * * it may well be that prosecutors will fear to do their duty and need to have the aid of a body of citizens, acting temporarily in an official capacity, to carry the responsibility of accusing powerful and malignant interests. The grand jury, under such conditions, affords a safe and secret agent before which individual witnesses may come and safely disclose what they know." Journal, American Judicature Society, October, 1920, p. 77, quoted by Willoughby, 194.

25. "* * * breathes the spirit of the community." 42 Yale Law Journal, 164. The Panel No. 2 at 16 "Citizen Agency" Orfield, 146.

"* * * reliance is placed upon its good conscience as representative and protector of the community." 39 California Law Review, 575.

"They are the voice of the community accusing its members, and the only protection from such accusation is the conscience of that tribunal." Judge Learned

Hand speaking In re Kittle, C.C., 180 F. 946, 947.

"The result is, of course, to give the grand jury inquisitorial powers. Its temporary constitution and its popular character must be the guaranty against their abuse." In re Bornn Hat Co., C.C., 184 F. 506, 509.

26. "The inquisitorial power of the grand jury is the most valuable function which it possesses to-day and, far more than any supposed protection which it gives to the accused, justifies its survival as an institution." In re Grand Jury Proceedings, D.C.E.D.Pa.1933, 4 F.Supp. 283, 284 (Kirkpatrick).

27. "A grand jury with adequate powers of independent investigation can be an effective means by which public-spirited citizens may attack criminal conditions in the community." 4 Stanford Law Review, 77–78, 12 Panel 8, 12 (1934).

28. "The administration of the criminal law must in the last analysis be in the hands of the community itself. This is essential, first in order that crime may not escape punishment by reason of the incompetence or corruption of public officers, and, second, in order that the innocent and the free may not be subjected to illegal compulsion through the encroachment of governmental power." A. V. Shaw, The Grand Jury—Use it or Lose it, 32 Journal of the American Judicature Society, 6 (1948).

29. In Griffin v. United States, 295 F. 437, 439, the Court of Appeals of the Third Circuit granted "a new trial because of newspaper reports, published during the trial, of statements made by the Assistant United States Attorney who conducted the trial."

"Attorneys are officers of the court, and the United States attorney does not by taking office escape from this species of professional discipline." United States v. Maresca, D.C., 266 F. 713, 717.

court. Thus there can be no support for the position that the grand jury is an independent planet divorced from the court.[30]

■ Upon this basis, it is urged with much insistence that the grand jury who returned the indictments in this case acted contrary to instructions in considering these cases. The proceedings shown in the record are not, in the opinion of the court, compatible with such a conclusion. The grand jury were in session for months considering this matter, so it must be assumed there was tacit acquiescence at least. While the court may exercise an influence over the proceedings, there is neither a method whereby an indictment by a grand jury can be peremptorily required, nor, on the other hand, is there any method of preventing the presentment of an indictment[31] except by summary discharge.

■ There are various methods by which the court may exercise control.[32] An independent judiciary has power to exercise this authority without negation by higher courts or outside agencies. The judge may discharge a grand jury at any time, for any reason or for no reason,[33] and whether they have finished the matters in hand or not.[34] He may give instructions[35] which do not constitute precedents and which cannot be controlled or corrected by appellate courts.[36] These may

30. See In re National Window Glass Workers, D.C., 287 F. 219, 225.

31. In defense of the Dean of St. Asaph, Erskine said, "If a man were to commit a capital offense in the face of all the judges of England, their united authority could not put him upon his trial; they could file no complaint against him even upon the records of the Supreme Criminal Court, but could only commit him for safe custody, which is equally competent to every common justice of the peace. The grand jury alone could arraign him, and in their discretion might likewise finally discharge him by throwing out the bill, with the names of all your lordships as witnesses on the back of it." 21 How.St.Tr.(Eng.) 847, 977.

Application of Texas Co., D.C., 27 F. Supp. 847, 850.

32. "However, court interference is sanctioned when the grand jury is infringing a right of the individual witness or defendant who is before it. A grand jury may not deny the constitutional privilege against self-incrimination. A witness may remain silent on that ground without punishment for contempt; a defendant may move to quash an indictment based on evidence obtained in violation of the privilege. Similarly, a grand jury may not impair the constitutional protection against unreasonable searches and seizures. If a subpoena duces tecum issued at the request of a grand jury is oppressive in scope, it may be quashed. If evidence used as the basis for an indictment was illegally obtained, the indictment may be quashed." 4 Stanford Law Review, 71–72.

It is to be noted that none of these grounds is listed by counsel as applicable to the instant motion to dismiss. Counselman v. Hitchcock, 142 U.S. 547, 12 S. Ct. 195, 35 L.Ed. 1110; United States v. Medical Society of District of Columbia, D.C., 26 F.Supp. 55; In re Fried, 2 Cir., 161 F.2d 453, 1 A.L.R.2d 996.

33. Rule 6(g), Federal Rules of Criminal Procedure, 18 U.S.C.A.; see In re National Window Glass Workers, D.C., 287 F. 219, 225; Baker v. State, 183 Ind. 1, 108 N.E. 7, L.R.A.1915D, 1061.

34. In a nationally famous incident, Judge Geiger, of the Federal District Court in Wisconsin, discharged a jury to prevent the return of an indictment. He was threatened with impeachment proceedings by Attorney General Cummings, but the grand jury was discharged. New York Times, 1937, December 18, p. 1, col. 3; December 20, p. 1, col. 2, p. 4, col. 6; 1938, January 12, p. 4, col. 4; January 23, p. 5, col. 1; January 25, p. 6, col. 6; January 26, p. 4, col. 2; January 31, p. 1, col. 2; February 16, p. 7, col. 2.

35. "It is the custom for the justice to go to the indictors to encourage and inform them." Y.B. 14 and 15, Edward III 26 (1340).

For examples of charges to grand juries, see Fed.Cas.Nos.18,246 to 18,277, 30 Fed.Cas. pp. 976–1051.

"In the course of centuries charges to grand juries may have contained much wisdom, but I suspect they also produced much rubbish." MacKinnon, On Circuit, 151.

36. There has never been an instance where instruction to a grand jury was

be political manifestoes. They may be entirely erroneous. These may include cautions and admonitions to fit local conditions and guard against dangers which the judge believes exist at the moment.[37] The court may also refuse process to the grand jury if it believe that the inquiry is improper for any reason.[38] The court may refuse to authorize expenses to the grand jury and thus prevent the employment of investigators or independent counsel.[39] Finally, it may discipline the attorneys, the attendants or the grand jurors themselves[40] for breach of the secrecy surrounding the body. These powers protect the independence of the trial judges so that they are not hampered in the control of the courts over which they preside.

But, to balance that independence of the judge, the grand jury developed a stubborn tenacity of its own. Ever since they wrote "Ignoramus" upon the bill of indictment presented by the Crown against the Earl of Shaftesbury,[41] it has been held an inviolable tradition that they need follow the orders or instructions of the judge[42] neither as to what they consider

held error by an appellate court. If the indictment is good and the trial fair, that ends the matter, irrespective of what the judge may have said to the grand jury.

37. The charge of Justice Field embodied cautions regarding communications received from outside. The use of these remarks as a precedent for limiting the scope of inquiry is, of course, erroneous. Hale v. Henkel, supra. It is assumed that the court might give similar cautions to a grand jury today, but, if they asserted their independence and returned an indictment out of an independent investigation, neither could they be chastized therefor nor could the indictment properly be set aside.

38. In re National Window Glass Workers, D.C., 287 F. 219.
The power of the court to exercise incidental control is conceded. " * * * logically it would seem to be a facet of the court's general power to prevent abuse of its processes." 39 California Law Review, 577.

39. Usually the grand jury rely upon the United States Attorney's office to supply their investigative aid. 4 Stanford Law Review, p. 70.

40. The power of the court over grand jurors and attorneys is summary and plenary, as the statute shows: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
"(2) Misbehavior of any of its officers in their official transactions.
"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C.A. § 401.

See Application of Texas Company, D. C., 27 F.Supp. 847.
In re Summerhayes, D.C.N.D.Cal., 70 F. 769.

41. 8 Howell's State Trials (Eng.) 759, 821. See Notes 16 and 17.

42. The charge of Justice Field limits the grand jury to a consideration of what may be ordered to be investigated by the judge or the prosecutor. Hale v. Henkel, 201 U.S. 43, 61, 26 S.Ct. 370, 373, directly rejects this view quoting Justice Wilson: "It has been alleged that grand juries are confined, in their inquires, to the bills offered to them, to the crimes given them in charge, and to the evidence brought before them by the prosecutor. But these conceptions are much too contracted; they present but a very imperfect and unsatisfactory view of the duty required from grand jurors, and of the trust reposed in them. They are not appointed for the prosecutor or for the court; they are appointed for the government and for the people; and of both the government and people it is surely the concernment that, on one hand, all crimes, whether given or not given in charge, whether described or not described with professional skill, should receive the punishment which the law denounces; * * *."
See Note 1.
The case of United States v. Thompson, supra, follows and reinforces this authority.
"If it be asked how or in what manner, the Juries shall enquire; the answer is ready, according to the best of their understandings. They only, not the Judges are sworn to search diligently to find out all Treasons, etc. within their charge, & they must and ought to use their own discretion in the way and manner of their enquiry: No directions can

nor as to whom they indict or fail to indict.[43] The grand jury is similar to the trial jury, who may convict notwithstanding positive instructions to acquit and who may pardon notwithstanding a direction to find guilty. Unquestionably, the grand jury are under no necessity to follow the orders of the prosecutor.[44] They can present an indictment whether he will or no.[45] Indeed, they may make a presentment contrary to the direct orders of a judge,[46] the prosecutor for the King[47] or the Chief Executive.[48]

legally be imposed upon them by any Court or Judges; * * *." Somers, 31–32.

43. "The grand jury of modern times still retains some traces of antiquity which have been lost to the other varieties of the jury. They consider the evidence in secret and the court does not control or advise them as to their findings in the individual cases which come before them. * * * It merely charges them generally as to the nature of the business which they are about to consider. They can always act if they please upon their own knowledge." 1 Holdsworth, 322–323.
Kinghorn, 367, 371 ff.
The most credible authority has reported that Hon. Frank H. Rudkin, at that time United States District Judge for the District of Washington and later Chief Judge of the Court of Appeals of the Ninth Circuit, pointedly refused to caution a grand jury against investigation of a government official.
In the course of twenty years as a federal judge, the writer has consistently advised grand juries of their power to act independently in investigation and their duty to diligently inquire into crimes against the United States triable in the District. Likewise, the writer has steadfastly refused to intervene to stop an independent investigation or to discharge a jury to prevent an indictment.
The practice of these courts when there was no controversy pending seems to me to be conclusive as to the general rule and the actual practice which has been transmitted to us through a long course of centuries from the grand juries of England and which was preserved for the benefit of the accused and the public by the clause of the Constitution.

44. "The government attorney's duty is to advise and assist the grand jury; he has no powers of control over it." 39 California Law Review 576.
Neither the Attorney General of the United States nor a United States Attorney may summon a grand jury. This function belongs exclusively to the court. Rule 6, Federal Rules of Criminal Procedure, states the immemorial practice and power by providing, "The court shall order one or more grand juries."

"8. What is the place of the United States Attorney (or his assistant) in the functioning of the grand jury? You must naturally accord him the respect due an officer of the government, sworn to protect and enforce its laws; you must realize that usually he is an intelligent, experienced individual acting in all sincerity. But do not forget that he is, from the viewpoint of the grand jury, only a lawyer, an agent of the Federal Department of Justice and by law he is only the legal advisor to the grand jury. This does not make him infallible in his opinions, although his experience and position require respectful attention of the jurors. Should a dispute arise between him and the grand jury, recourse should be had to the federal judge who administered the oath to you." The grand jury has the power and duty: "7. To insist at all times on the independence of the grand jury from pressures of any sort, whether these stem from the prosecuting official or the court * * *." Manual for Grand Jurors, prepared by the Federal Grand Jurors Association for the Eastern District of New York, Congressional Record, February 21, 1952, A1115.

45. "The grand jury was appointed to protect community welfare, not merely to aid prosecutor or court." 4 Stanford Law Review, 68–69.

46. " * * * and this would be but a slender screen or safeguard, if every justice of the peace * * * may make the grand jury present what he pleases or otherwise fine them." Forsyth, Trial by Jury, 181. United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333; Hale v. Henkel, 201 U.S. 43, 59, 66, 26 S. Ct. 370, 50 L.Ed. 652; Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L. Ed. 979.

47. " * * * if for fear of being unworthily reproached as Ignoramus Jury-Men, obstinate fellows, that obstruct Justice, and disserve the King, the Grand Jury shall suffer the Judges, or the Kings Counsel to prevail with them, to indorse Billa vera, when their Consciences are not satisfied in the truth of the Ac-

48. See note 48 on following page.

■ This power of the grand jury springs from inherent qualities. The jurors are instruments of the people of the community. They reflect the sentiment of the particular locale—the fama publica.[49] In their character as representatives, they may call for witnesses and documents which may verify or negative the suspicions [50] or rumors of crime which affect the neighborhood.[51] In his character as witness, each may speak of those things which he himself has observed.[52] In England the private person who claimed a crime had been committed could lay an indictment before the grand jury.[53] Although private prosecutions as such have been abandoned in this country,[54] the grand jurors retain enough of this tradition that they may initiate prosecutions based on information received from persons who have no connection officially with them.[55]

■ Under the Federal Constitution, a grand jury may either present or indict.[56] The word "presentment" technically characterizes the process whereby a grand jury initiates an independent investigation and asks that a charge be drawn to cover the facts should they constitute a crime.[57] The

cusation, they act directly against their Oaths, oppress the innocent whom they ought to protect as far as in them lies, subject their Country, themselves, and posterity to Arbitrary powers, pervert the administration of justice, and overthrow the Government, which is instituted for the obtaining of it, and subsists by it." Somers, 85–86.

48. "If you believe the president's [President Hayes, 1879] instructions to the district attorney were intended to prevent you from making the fullest investigation into the matter now before you, and from returning an indictment against the accused if the evidence should warrant it, you should be inspired with additional determination to do your duty. The moment the executive is allowed to control the action of the courts in the administration of criminal justice their independence is gone." In re Miller, 17 Fed. Cas. p. 295, No. 9,552.

49. See United States v. Central Supply, Association, D.C., 34 F.Supp. 241, 243.

50. " * * * in this country the common practice is for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and, after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment." Frisbie v. United States, 157 U.S. 160, 163, 15 S.Ct. 586, 587, 39 L.Ed. 657.

51. Hale v. Henkel, 201 U.S. 43, 62–67, 26 S.Ct. 370, 50 L.Ed. 652. See quotation in Note 46.

52. "In a broad sense grand jurors themselves are witnesses; for a grand jury may act upon knowledge acquired either from their own observations or from the evidence of witnesses given before them."

Goodman v. United States, 9 Cir., 108 F.2d 516, 519–520, 127 A.L.R. 265.

53. An interesting dissertation on modes of early English accusation is set forth in I Stephen 244–250.
"At common law any person may take proceedings by way of indictment in respect of any crime * * *." 2 Russel, 1778.
"Still in the case of most crimes until 1933 [in England], an indictment could be preferred by a private individual on his own initiative, * * *." Burrows, Criminal Law and Procedure, 51 Law Q.Rev., 36, 50.
See Note 13.

54. National Commission on Law Observance and Enforcement, Report on Prosecution (1931), p. 34.

55. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Orfield, 135, 136, 159.

56. Amendment V, Constitution of the United States.
See Note 18.

57. "A presentment is an accusation brought forward by the grand jury of their own mere motion. An indictment is a particular charge laid by the public prosecutor before the grand jury and by them found to be true." 2 Wilson's Works, 363.
"The presentment, however, is made by the grand jury. * * * In making a presentment the grand jury is playing the role of a prosecutor. For that reason a presentment must be drawn up into a bill of indictment and resubmitted to the grand jury." Orfield, 157.
" 'Presentment is a more comprehensive term than indictment.' All the answers given by jurors to the articles of the eyre or of the turn are presentments. The usage of Bracton's day seems to restrict the term indictati to

authority to initiate independent investigations [58] cannot be taken away without erasing the word "presentment" from the fundamental law of the land.

There is in the motion to dismiss a series of specifications criticizing the receipt of "unauthorized communications," oral and written, by this grand jury. It is alleged with positiveness that O'Gara, a duly qualfied and acting Assistant United States Attorney, who was not presently assigned to the investigation, gave to one of the grand jurors the Kefauver Committee Report, the specification prepared by Thomas Doolan, an accountant of the Income Tax Department, and notes made by the Assistant United States Attorney himself. It is stated O'Gara and Doolan conferred with one member of the sitting grand jury, where the Doolan specifications were turned over and the case fully discussed and notes were made by the grand juror. Other instances of communications outside of the grand jury room between the Assistant United States Attorney and members of another grand jury are mentioned. It is said these communications are unauthorized and illegal.

The sources of grand jury information are almost unlimited.[59] The grand jury are constituted for the express purpose of inquiring into and making indictment or presentment of all crimes against the United States committed in the district for which they were drawn,[60] namely, the

---

those who are presented as malecrediti of some felonia. It will be remembered that at the present day every indictment is a presentment. The grand jurors 'upon their oaths present that etc.'" Hale, P.C. ii, 152, cited in 2 Pol. & M., 652.

Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652.

**58.** Mr. Justice Field by implication limits the power of a grand jury to proceed upon its own initiative without a defined charge or definite defendant. But in Hale v. Henkel, supra, 201 U.S. at page 61, 26 S.Ct. at page 373, it is said, "While presentments have largely fallen into disuse in this country, the practice of grand juries of acting upon notice, either of their own knowledge or upon information obtained by them, and incorporating their findings in an indictment, still largely obtains."

See Note 1.

The grand jury should be respected "as a great historic instrument of lay inquiry into criminal wrongdoing." United States v. Johnson, 319 U.S. 503, 512, 63 S.Ct. 1233 1237, 87 L.Ed. 1546.

"Sources of power of the grand jury.
\* \* \* \* \* \*

"7. It is an independent investigatory body and can launch its own inquiry into crime when there is a strong reason to suspect its powers are being thwarted by anyone." Manual for Grand Jurors, prepared by the Federal Grand Jurors Association for the Eastern District of New York. Congressional Record, February 21, 1951, A1115.

It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquires is not to be limited narrowly by questions of propriety or forecast of the probable result of the investigation or by doubts whether any particular individual will be found properly subject to an accusation for crime. 4 Stanford Law Review, 68.

Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979.

**59.** Housel & Walser, Defending and Prosecuting Federal Criminal Cases (2d Ed.) 279.

"Authority is thus given for a general investigation by a grand jury when it received information from any source which points to the probability that some crime has been committed, even though the criminal and the exact circumstances of the criminal act are not known either to the prosecuting officer or to the grand jury itself." 13 Columbia Law Review 168, Comment upon McKinney v. United States, 8 Cir., 199 F. 25, where the Court of Appeals sustained the denial of a motion to quash the indictment made on the ground that it was returned upon hearsay and other incompetent evidence.

**60.** In re Grand Jury Proceedings, D.C., 4 F.Supp. 283.

"A more accurate statement might be that the power is limited only by the jurisdiction of the court to which the grand jury is an appendage." 39 Cal.Law Review 577.

Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; United States v. Hill, 26 Fed.Cas. pp. 315, 317, No. 15,364.

"The grand jury is clothed with plenary inquisitorial powers, and it has the power, and it is its duty, to inquire into all crimes against the United States committed or triable within the jurisdiction

Northern District of California. . They were sworn to do just that.[61] It cannot be held that any investigation made by them for that express purpose and in accordance with that oath is or was unauthorized.[62] It has always been said that they can act of their own knowledge or on testimony which comes to them through witnesses.[63] At-

of the Court to which it was summoned—whether brought to its attention by the United States attorney or through some other agency." Housel & Walser, 278–279.

61. The oath administered in the Northern District of California follows exactly the ancient formula which goes back at least to the seventeenth century. MacKinnon, On Circuit, 11, 12. Hale v. Henkel, supra, 201 U.S. at page 60, 26 S.Ct. 370, shows that this oath was interpreted to mean diligently to inquire into all crimes committed within the jurisdiction of the court. The Code of Criminal Procedure interprets this in § 126 as follows: "You will diligently inquire into and true presentment make of all indictable offenses triable within the county, which shall be given you in charge or *shall otherwise come to your knowledge*." The commentary to this section shows this to be an accurate representation of the provisions in the state codes. American Law Institute, Code of Criminal Procedure, official draft June 15, 1930, commentary to § 126 pp. 473–478.

Justice Chase says:

"You have been selected among your fellow-citizens for your intelligence, your impartiality, and your integrity, to inquire concerning offenses against the United States within the district of West Virginia. Your general duties are sufficiently defined by your oath, which binds you under the most solemn obligations to present no one from envy, hatred, or ill-will, and to leave no one unrepresented from fear, favor, and affection. The same oath binds you to diligent inquiry as well as true presentment." 30 Fed. Cas.No.18,248, p. 980, Chase, 263.

A bailiff and accusing jury were charged with conspiracy. The bailiff said he had been ordered by the court to attend the jurors and tell them what he knew of the matter. The jurors "said that they were sworn in said inquest to inquire for the King and indicted the plaintiff * * *; and so they did this by reason of their oath and the compulsion of the law." Y.B. 9, Henry IV, Mich. pl. 24, cited by Thayer, 125, note 2.

62. "You will not acquit yourselves of these obligations by slight or careless investigation. You must not be satisfied by acting upon such cases only as may be brought before you by the district attorney, or by members of your body to whom knowledge of particular offenses may have come. Your authority and your duty go much further. You may, and you should, summon before you officers of the government, and others whom you may have reason to believe possess information proper for your action, and examine them fully. Officers connected with the collection of internal revenue—collectors and assessors, and their subordinates—may with special propriety be thus examined." 30 Fed. Cas.No.18,248, Chase, 263.

Courts should not interfere with grand juries acting within the scope of their power to investigate all matters pertaining to crimes cognizable by the District Court. United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849; In re Bornn Hat Co., C.C., 184 F. 506, affirmed 233 U.S. 713, 32 S.Ct. 521, 56 L.Ed. 626; O'Connell v. United States, 2 Cir., 40 F.2d 201.

"* * * the laws of the United States have erected courts which are invested with criminal jurisdiction. This jurisdiction they are bound to exercise, and it can only be exercised through the instrumentality of grand juries. * * * Grand juries are accessaries to the criminal jurisdiction of a court, * * * and are bound to act, so far as they can aid that jurisdiction." Chief Justice Marshall in United States v. Hill, 26 Fed.Cas.No. 15,364, pp. 315, 317, 1 Brock. 156.

"It [the grand jury] is organized for the purpose of discovering and reporting to the court all offenses committed within its jurisdiction." Orfield, 145.

63. "The accusation may be made by the grand jurors on their own knowledge or information, or by finding (i.e., endorsing and returning as a true bill) a bill of indictment presented to them by a public or private prosecutor, after examining, in private and on oath, one or more witnesses whose names are endorsed on the bill when sent before them. Archb.Cr.Pl. (26th Ed.) 174." II Russel 1778.

Application of Texas Company, D.C., 27 F.Supp. 847; In re Charge to Grand Jury, 30 Fed.Cas.No.18,255, pp. 993, 994; Goodman v. United States, 9 Cir., 108 F.

tempts have been made to limit that language.[64] While an indictment should not be returned based upon hearsay alone, and the courts so instruct, the calling of witnesses may be initiated in a general investigation which has no particular defendant or charge involved.[65] But, when charges were made in the press and on the sidewalks of San Francisco, can it be said to be without the knowledge of the grand jurors? Any communication to a grand juror would be unauthorized unless made by the United States Attorney according to that argument. Everyone should know that is not true. The grand jurors had a right to use rumors, hearsay, reports and even suspicion[66] in initiating an investigation, and it made no difference whether these were oral or written or whether acquired inside or outside grand jury hearings, and the persons who gave information need not have been grand jurors or witnesses or under prescribed or other oath.[67]

2d 516; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652.

64. "In the first place, because while admitting the power of the grand jury, it yet denies such power, since it limits the right of that body to inquire by causing it to be unlawful for it to listen, without the approval of the court, to a suggestion of the district attorney under the circumstances stated, and therefore causes any finding made to depend upon an inquiry as to the particular source of information which led to the investigation from which the finding resulted." United States v. Thompson, 251 U.S. 407, 414, 40 S.Ct. 289, 292, 64 L.Ed. 333.

65. Orfield, Criminal Procedure from Arrest to Appeal, 158, 159.
   "As the specification of the identity of a defendant and the precise nature of his offense is normally the end, and not the beginning, of grand jury proceedings * * * it was not essential that the proceedings should state the name of a specified defendant under investigation." Hendricks v. United States, 223 U.S. 178, 184, 32 S.Ct. 313, 316, 56 L.Ed. 394.
   "The objections to the jurisdiction on the ground that there was no 'cause' or 'specific charge' pending before the grand jury were made and answered in Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, and require no further examination." Wilson v. United States, 221 U.S. 361, 372, 31 S.Ct. 538, 541, 55 L.Ed. 771.
   The common law practice is illustrated by the case of Earl of Maclysfield v. Starkey (1684), 10 How.St.Trials 1330, where though there was no specific charge, the grand jury examined witnesses to come at this knowledge.
   "The grand jury, not only historically but also in its present-day functioning, is necessarily an inquisitorial body, and may, if it wish, institute an investigation based on its suspicion that crimes have been committed without having any knowledge of the names or descriptions of the persons who may be involved. The inquiry does not have to be limited to the determination of the kind of crime which known persons may have committed." United States v. McGovern, D.C., 1 F.Supp. 568, 569.

66. "The Grand Jury being a secret tribunal, whose office is simply to frame accusations, and possessing no power, nor having cast on it the duty, of trying those against whom Bills are presented, is not of course bound by any of the rules of evidence applicable to the proceedings of tribunals for the trial of the guilt or innocence of the accused. They may, therefore, avail themselves of any sources of information that come within their reach, and act upon them or not, as they think fit; they may even read a paragraph from a newspaper (per Byles, J., Reg. v. Bullard, 12 Cox C.C., 353) look at the depositions of absent witnesses, without any proof that they were regularly taken (per Denman, J., Reg. v. Currans, 13 Cox C.C., 158) or trust to mere public rumour for the purpose of finding Bills. Such Indictments are perfectly good, and, according to the practice both of this country and of America, are not vitiated by the fact of the Grand Jury having received evidence that would be irrelevant or incompetent on the trial of the Indictment * * *." Kinghorn, 389.
   See United States v. McGovern, D.C., 1 F.Supp. 568.

67. Orfield, 162, 163; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. " 'Tis certainly inconsistent with their Oaths to shut their Ears against any lawful man that can tell them any thing relating unto a crime in question before them. No man will believe, nor can they themselves think that they desire to find and present the truths of a fact, if they shall refuse to hear any man, who shall

■ It is true, courts often caution the grand jurors not to act upon rumor or hearsay and not to allow anyone to seek them out through malice to get an indictment.[68] The purpose of 18 U.S.C.A. § 1504 was to prevent anyone from attempting to bring pressure upon or intimidate a grand juror by a written communication with that intent. But that section does not prohibit a grand juror from receiving a communication, written or oral. The grand jury could indict anyone for a violation of that section if the requisite elements were present. But not if they solicited a communication or indicated a willingness to receive one; then the requisite intent would not be present and there would be no crime.

There is no provision in the Criminal Rules of Procedure that the witnesses before the grand jury must be sworn,[69] although the foreman is given power to administer oaths, and that has been the immemorial practice. There is further no prohibition anywhere against a grand juror's communicating with anyone on the outside so long as he does not disclose what goes on before the grand jury. Therefore,

what is meant by unauthorized communication is undefined and unknown. There is no requirement anywhere that everyone who makes a communication to a grand juror must be sworn. The practice has been quite the contrary.[70]

■ It is next objected that none of this material was competent as evidence and that, since the grand jury had it before them, the indictment must be quashed. It is true, the Kefauver Committee Report could not be introduced at the trial. It was quarantined by statute.[71] The Doolan specifications may well have been a texture of conclusions and hearsay. The notes of the Assistant United States Attorney certainly would consist of his conclusions and could never be permitted in evidence. But these allegations have no substance as a matter of law.[72] The grand jury has the power to consider these writings as they could consider a newspaper article in order to have points to investigate. They are usually cautioned not to find an indictment upon such incompetent documents alone, but here the face of the indictment shows they had other evidence before them.[73] If a grand jury

---

pretend such knowledge of it, or such material Circumstances, as may be useful to discover it; * * *." Somers, 29–30.

68. The cautions of Mr. Justice Field, in his charge have been misinterpreted as laying down a general rule as to outside communications. Any such implication is refuted by the opinion of the Supreme Court of the United States in United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333, where the charge is quoted and given full effect, but the rule of absolute power and duty of the grand jury to investigate is laid down.
In Hale v. Henkel, supra, 201 U.S. at page 65, 26 S.Ct. at page 375, it is said, "Doubtless abuses of this power may be imagined, as if the object of the inquiry were merely to pry into the details of domestic or business life. But were such abuses called to the attention of the court, it would doubtless be alert to repress them. While the grand jury may not indict upon current rumors or unverified reports, they may act upon knowledge acquired either from their own observations or upon the evidence of witnesses, given before them."

69. The judges ought not to inquire whether the witnesses were properly sworn

"as the grand jury were at liberty to find a bill upon their own knowledge merely, and were anciently in the habit of doing so." Regina v. Russel (1841), 174 Eng. Reports (Rep.) 492.

70. Regina v. Russel, 174 Eng.Reports (Rep.) 492; Regina v. Bullard, 12 Cox C.C. 353.

71. 18 U.S.C.A. § 3486.

72. "All that appears on the face of the plea is that the preliminary affidavits and examination taken before the committing magistrate pursuant to the statute were placed before the grand jury as a part of their method of inquiry, and were considered by them. There is nothing to show that the grand jury made any improper use of these examinations or did not proceed according to law." Hope v. People, 83 N.Y. 418, 423, 38 Am.Rep. 460.

73. "Moreover, it does not state facts which would be sufficient, even on a motion, to require the court to quash the indictment. It does not aver or show that the ex-parte affidavits were the only evidence before the grand jury, nor that the witnesses by whom they were made were not also personally examined, * * *."

consider competent and incompetent evidence, they can still indict if the competent evidence is sufficient to convince them there is probable cause for them to believe, if it were unexplained, that a crime has been committed.[74]

█ This brings us to the point that there was no evidence before this body upon which an indictment could be based.[75] This jury sat for several months and considered the testimony of many witnesses. Therefore, we are of the opinion that the charge cannot be borne out. Upon such a basis, the court will neither examine the transcript nor take testimony. The inquiry would not be in the public interest. If incompetent evidence were offered at the trial, it would be rejected. If no competent evidence were offered, the cases would be dismissed.

█ The integrity of the grand jury and the grand jurors is next attacked by the defendants. The constitutional guaranty that no person shall be placed on trial in a federal court for felony without an indictment has been fulfilled. But defendants, after they have received this protection, attack the foundation of the institution itself by seeking to inquire into the motivation and personal habits of the grand jurors. It is charged that at one time O'Gara had members of the former grand jury[76] and the grand jury which returned the indictments into his home for a cocktail party, where the case was discussed, and that the grand jurors "engaged in corrupt practice" in considering the matters involved herein and that the indictments were returned as the result of "influence and intimidation and coercion practiced against" them.

There is no statute or rule of procedure which directs where the grand jury shall meet. It might be necessary, under certain circumstances in the struggle against organized crime, for them to meet in private houses or some other place for protection of the witnesses. It might be necessary for a single grand juror to seek information in a night club, a bar or a house of ill fame.[77]

Hope v. People, 83 N.Y. 418, 423, 38 Am.Rep. 460.

74. Orfield, 162; United States v. Oley, D.C., 21 F.Supp. 281; Frisbie v. United States, 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657; United States v. Silverthorne, D.C., 265 F. 853.

"The grand jury is a body known to the common law, to which is committed the duty of inquiring whether there be probable cause to believe the defendant guilty of the offense charged." Beavers v. Henkel, 194 U.S. 73, 84, 24 S.Ct. 605, 607, 48 L.Ed. 882.

"The demurrer to the special plea interposed on behalf of the prisoner was properly sustained. The substance of the plea is, that the grand jury, by whom the indictment was found, did not proceed in accordance with law, but considered, regarded and examined improper, incompetent and irrelevant matters, and the specification is that they had before them for their consideration, and as part of their method of inquiry, and did consider certain ex-parte affidavits taken before a police justice in an examination had before him as such, together with the examination of the prisoner, taken in accordance with the statute." Hope v. People, 83 N.Y. 418, 423, 38 Am.Rep. 460.

75. "Here, it is simply alleged that the investigation 'will reveal that there was no competent evidence of any kind or nature that was ever adduced before the grand jury tending to show guilt on the part of your movant of the charges alleged in the indictment * * *'. * * * Strong and positive showing is required of persons seeking such relief. Otherwise, it would be possible in every case by simply alleging the want of evidence or other irregularities to get 'a preview' of the Government's case in almost every instance, if the accused were so disposed." United States v. Brumfield, D.C., 85 F.Supp. 696, 705.

76. This interesting situation is foreshadowed by an ancient inquisition: "A case in 1681 in which a bill was taken away from the grand jury by the Clerk of the Crown Office before they could endorse it; they at once drew a bill against the Clerk of the Crown Office and sent it to another grand jury." Satterell's Diary, 1101, cited in I Holdsworth 322.

77. The Supreme Court quotes Justice Field as saying that an indictment can be returned "Not on rumors and reports, but by knowledge acquired from the evidence before you, and from your own observations." And no one contends this

His movements are not subject to question. If they were, effectiveness might be lost.

The grand jury could attend a cocktail party, severally or in a group, at the house of the prosecutor without question. In England in various localities, it was the duty of the Crown officer—the sheriff—to entertain the grand jury at lunch or at dinner.[78]

The court might well not approve of the conduct or discretion of the grand jurors or the Assistant United States Attorneys or any of them, but the remedy was discipline by contempt charges or by discharge of the jury if the public interest required. A defendant cannot question it.

Even if there are persons, therefore, who might be able to testify that they saw a grand juror talking to certain persons who might be conceived to have some malicious interest in prosecuting the case or that the grand jurors might have been discovered at some private social affair at which there were other persons whom it might be contended were improperly motivated, this fact would not assist either the court or the jury in determining whether or not the defendants named in these indictments are innocent or guilty of the crimes charged.

The charges against the grand jurors are unwarranted. They are impertinent since there is no authority which has been cited to the court which would indicate that such matters could be inquired into nor has any such authority been discovered by research.

The court conceives defendants did not enjoy being indicted. Most people do not. But that furnishes no ground for an attack in court on the integrity and motives of the jurors.[79] In a time when our institutions are under subversive attack, it seems this precedent should not have been set. If the lords of the underworld or the emissaries of subversives were able to follow such a procedure and shadow grand jurors, prosecutions in those types of cases would cease.

An inquisition into the private lives and concerns of grand jurors and their private conduct is an ill method in which to repay an arduous public service. These men and women have been dragged from their ordinary concerns and required by compulsory process to spend months at the public business which did not concern them except as it concerned all other citizens. Such service should not be rewarded by abuse.

The grand juror is not to be subjected to inquisition into his motives. He is not to be subjected to examination into what he did while serving on the grand jury. The court should not make such inquiries and has the power to punish as a contempt any such attempt by anyone, whether the grand jury be discharged or not.

The grand jurors have never been subject to question, criminal prosecution or civil liability for any motive which impelled indictment. Even if one or more were actuated by active malice, this would constitute ground neither for liability nor for quashing the indictment.[80]

is not true. But no limits are set upon a grand juror's investigation, for the Supreme Court quotes Justice Wilson as saying:

"The oath of a grand juryman—and his oath is the commission under which he acts—assigns no limits, except those marked by diligence itself, to the course of his inquiries: Why, then, should it be circumscribed by more contracted boundaries? Shall diligent inquiry be enjoined? And shall the means and opportunities of inquiry be prohibited or restrained?" Hale v. Henkel, 201 U.S. 43, 62, 26 S.Ct. 370, 374.

See Note 1.

78. "On the first evening of each Assize at Liverpool and Manchester, the Sheriff entertains the Grand Jury at dinner, and

at Lancaster he entertains them at luncheon." MacKinnon, On Circuit, 18.

79. "SOURCES OF POWER OF THE GRAND JURY.

\*  \*  \*  \*  \*  \*  \*

"4. No power can punish its members for having indicted or refused to indict." Manual for Grand Jurors prepared by the Federal Grand Jurors' Association for the Eastern District of New York. Congressional Record, February 21, 1952, A1115.

80. "During the whole time of their proceedings grand jurors are protected in the discharge of their duties, and no action lies against them for their findings even when predicated upon malice." Orfield, 161.

The specifications thus disposed of include the charges that the indictment was "arbitrary," not "voluntary," "irregularly and improperly" returned, "capricious," based on "personal prejudice," was returned for the purpose of "appeasing the press," was in "willful disregard of the rights of the accused," and that the grand jury exceeded its "lawful powers."

All this was within the competence of the grand jury. From whatever motive they acted, the result is the same. An indictment has been returned.[81] One of the chief reasons for the veil of secrecy is that the vote of the individual shall be concealed from all who might question him elsewhere.[82] This protection from oppression is extended in return for his outstanding public service. If the courts permit such matters to be revealed, there will not be many citizens who, in addition to its manifest inconvenience, would accept a service so potentially dangerous. Therefore, the court will not examine any charges based upon motive of the grand jurors or any of them.

There is a specification that the indictment should be quashed because it "was returned for the purpose of appeasing the press." This is another question of the motives of the grand jurors, but it has other implications. The American press is one of the key factors of freedom. The untrammeled exposition of news is protected by the guaranties of the Constitution. In practice, the fearless expression of fact and opinion has rid numberless communities in this country of organized crime and has exposed disloyalty and plots to overthrow the government of the United States. Newspapers lead the way in the exposure of the political corruption in government. When such matters are broadcast in the papers, all of us who live in the community, grand jurors, petit jurors and citizens, who may be so included in the future, are exposed to them and form certain general conclusions. We do not live in a vacuum.

The fact that a grand jury began its inquiries in a certain field or found an indictment in accordance with matters developed by the newspapers cannot be used to attack the indictment.[83] If it were, there could be no prosecutions. No murder is the subject of indictment which has not been discussed by the papers. If the facts published accorded with the indictment, a charge could be made that the indictment was returned to appease the press.

Another specification is that members of the grand jury and later, it is said, members of the United States Attorney's office

---

Most states have, by judicial decision, established the rule that, the grand jury being an essential part of the machinery of the court, a person cannot be held responsible for what he said or did as a member of a grand jury, however groundless his action may have been and even though a true bill was found willfully, falsely and fraudulently and through actual malice and ill will. Sidener v. Russell, 34 Ill.App. 446; Hunter v. Mathis, 40 Ind. 356; Engelke v. Chouteau, 98 Mo. 629, 12 S.W. 358; Turpen v. Booth, 56 Cal. 65. Some states have recognized this same rule by statute. Thornton v. Marshall, 92 Ga. 548, 17 S.E. 926; Ullman v. Abrams, 9 Bush, Ky., 738; Black v. Sugg, Hardin, Ky., 566. This rule has also been recognized and accepted, though in dicta, by the federal courts. Yaselli v. Goff, 2 Cir., 12 F.2d 396, 56 A.L.R. 1239, 1249; Adams v. Home Owners Loan Corp., 8 Cir., 107 F.2d 139, 141. The only limitation on the immunity of grand jurors is jurisdictional. If they act beyond the scope of their powers and without authority or jurisdiction, they are liable in an action for defamation or for trespass by the person injured.

81. The protection afforded by the rule of secrecy to the citizen who is being investigated where there is no public charge is unavailable when an indictment has been returned. "One who is unjustly accused, but is exonerated by the refusal of the grand jury to indict, may not suffer injustice by a disclosure that he has been under investigation for the commission of a crime." Goodman v. United States, 9 Cir., 108 F.2d 516, 519, 127 A.L.R. 265. But, if he is indicted, the reason for secrecy is at an end.

82. " * * * so that the jurors may deliberate and vote without fear that their conduct will be disclosed elsewhere, * * *." Goodman v. United States, 9 Cir., 108 F.2d 516, 519, 127 A.L.R. 265.

83. See Notes 59, 67.

disclosed matters before the grand jury to unauthorized persons without direction of the court, and they conspired to disclose to newspaper reporters the subject matter of the grand jury's inquiry, the identity of the witnesses appearing before it and the content of their testimony.

All the Assistant United States Attorneys were bound by their official oath to an obligation of secrecy. It is said that it was flagrantly violated by Assistant United States Attorneys of each of the two factions in that office. The proceedings of the grand jury room became as public as the happenings on Market Street. If so, the policy of secrecy upon which the continuance of the grand jury as an institution rests was imperiled. For the oath is binding upon these officials even today after the grand jury has been discharged. Unless these officials have been absolved by court order, the oath is yet binding.

In argument it was stated that there were sixty-two recorded breaches of the silence imposed by oath on members of the grand juries. For this there is, of course, no excuse. The supposed custom of grand jurors to violate their oaths would be ludicrous if it were not for the seeming lack of regard for any sanction. The failure to observe the obligation cannot be paliated or defended. There may be an explanation in that everyone else seemed to be regarding the sanction of an oath as a triviality.

The court has been insistent upon protecting the secrecy of the grand jury [84] in the public interest.[85] By this device, since ancient times, the individual votes were concealed from the public and the Crown or the government.[86] Likewise, the various arguments whereby the grand jurors arrived at the result were concealed. For their protection and for the protection of the prosecution, the identity of witnesses and the probable substance of their testimony was also hidden from light.[87] It will be apparent that, in a battle with organized crime under modern conditions, this is still an inviolable necessity.

Since secrecy is the inherent quality of a grand jury, the judges may punish a breach thereof summarily as a contempt if it occurs among the jurors,[88] attorneys or attaches of the court.[89] With either of these also, a grand jury could indict, if they approved such a charge. These matters could well have been punished by the court

84. "That in many cases, or in a particular case, no harm may be done, is of little consequence in determining the question of legal right. Many cases require the utmost secrecy, especially cases which recently have come before the courts relating to enterprises and offenses against the government and against neutrality." United States v. Providence Tribune Co., D.C., 241 F. 524, 529.

85. The reasons assigned by most courts and legal authorities are: (1) to prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations by protecting them from the importunity and sinister influence of persons suspected and their friends; (3) to prevent subornation of perjury or tampering with witnesses who appear before the grand jury and later appear at the trial; (4) to protect witnesses, so as to encourage them to appear, make complaints, and testify fully; (5) to protect the good names of innocent persons investigated but not indicted. United States v. Amazon Industrial Chemical Corporation, D.C.D.Md., 55 F.2d 254, 261; VIII Wigmore on Evidence (3d Ed.), §§ 2360, 2362; United States v. Central Supply Association, D.C., 34 F. Supp. 241, 245. See especially Goodman v. United States, 9 Cir., 108 F.2d 516, 519, 127 A.L.R. 265.

86. "From earliest times it has been the policy of the law to shield the proceedings of these bodies [grand juries] from public scrutiny * * *." Goodman v. United States, 9 Cir., 108 F.2d 516, 519, 127 A.L.R. 265.

87. Somers, 46, 47, 54, 55.

88. A juror was sentenced in the Northern District of California for six months' imprisonment in 1895 upon contempt proceedings, where it was charged that a grand juror had accosted a person, previously a witness before the body, in the Palace Hotel, telling many things which had occurred before the grand jury and suggesting that for money an indictment might be obtained. The incidental approval of the Field charge had no bearing on the decision. In re Summerhayes, D.C., 70 F. 769.

89. 18 U.S.C.A. § 401.

in the case of either grand juror or United states Attorney.[90] However, this problem was one for the court, under charge of whom the particular grand jury was sitting, for whatever disciplinary measures might be necessary. At the present time, no further attention thereto is demanded by the situation.

Although no specification makes a charge directly against the press, there are implications apparent. It seems quite clear that, from the specifications, official misconduct was the source of the printed revelations. There might be an argument made that, if grand jurors and Assistant United States Attorneys continued to talk, what they said should be printed in the public interest.

The press should exercise its great power ethically. The secrecy of the grand jury is the one quality which makes the body an effective instrument of the people. It would be unethical for the press to destroy this safeguard of democracy by publishing its doings and utterances. Once destroyed or abolished, shall its place be taken by the inquisition under drugs rumored to be practiced in certain countries under democratic rule or by inquisition in camera of the magistrates of other continental countries? Or shall the place be taken by the official who arbitrarily indicts or refuses to indict at his pleasure?[91] Perhaps, if one guarantee of liberty is weakened, there may be a chain reaction as to others. In a republic, such considerations addressed to freedom loving people should suffice.

The accused has no right to the secrecy of the grand jury.[92] As shown above, it was not imposed for his benefit, but for two purposes: first, to save the grand jurors from embarrassment, pressure, threats, and reprisals from having their part in an indictment known; second, to aid the government in prosecution.[93] A violation of the secrecy does not harm a defendant. It only opens up knowledge of the government's case, shows him what witnesses may be called and what documents produced. He is in a much better position when, as in this case, he is confronted with divided counsels on the part of the prosecution. The court will not open up the record and take testimony to further his cause.

90. In re Sylvester, D.C., 41 F.2d 231, 236.

91. But in cases which involve large scale criminal activity or in other instances in which public officers may be subject to powerful pressures, the nonpolitical grand jury can do much to protect the public interest. 4 Stanford Law Review, 68–69.

92. After an indictment has been returned, the veil of secrecy has never been intended as a safeguard for the accused. Kinghorn, 370; United States v. Central Supply Association, D.C., 34 F.Supp. 241. "The rule of secrecy, it will be noted, was designed for the protection of the witnesses who appear and for the purpose of allowing a wider and freer scope to the grand jury itself, and was never intended as a safeguard for the interests of the accused or of any third person." In re Grand Jury Proceedings, D.C., 4 F.Supp. 283, 284–285.
The rule requiring secrecy of proceedings of investigating grand jury is for the protection of the public, grand jurors and witnesses, and is not for the benefit of the accused, whose constitutional and statutory rights are not affected. State v. Rothrock, 45 Nev. 214, 200 P. 525; Howard v. State, 60 Ga.App. 229, 4 S.E. 2d 418; Commonwealth v. Kirk, 340 Pa. 346, 17 A.2d 195; Commonwealth v. Brownmiller, 141 Pa.Super. 107, 14 A.2d 907.

93. Goodman v. United States, 9 Cir., 108 F.2d 516; United States v. Central Supply Association, D.C., 34 F.Supp. 241. "The chief objection to the doctrine of the principal case is the danger that the grand jury may abuse its power, a danger more imaginary than real. For it is only through the courts that the attendance of witnesses may be enforced and punishment inflicted for refusal to answer. Commonwealth v. Bannon, 1867, 97 Mass. 214; Heard v. Pierce, 1851, 8 Cush., [Mass.], 338; Ward v. State, supra, [2 Mo. 120]. The possession of the inquisitorial power under such restraint by the courts would seem to be the greatest service to the people in the enforcement of the laws." 6 Columbia Law Review 347, 348. The tenor of this note is that the weakening of the prosecution's case is the basis of the court's power to enforce the obligations of secrecy after the jury is discharged.

The defense have based several specifications upon the action of one or another of the Assistant United States Attorneys. These are that the grand jury (1) received unauthorized writings from unauthorized persons, (2) received unauthorized oral communications, (3) carried on business in the presence of unauthorized persons, (4) received instructions on the law from unauthorized persons, (5) were coerced by undue insistence that an indictment be returned, (6) received testimony from Smyth and Doyle, upon subpoena and examination by an Assistant United States Attorney, concerning the very matters upon which they were subsequently indicted, whereby they are claimed to have received a bath of immunity.

Points 1 and 2, relating to unauthorized communications, have already been dealt with. Point 3 relates to O'Gara, an Assistant United States Attorney. McMillan, Chief Deputy United States Attorney, objected to O'Gara's presenting the same matters to the grand jury which McMillan himself subsequently presented and obtained the present indictments which he claims are valid. He thereby opened up the present controversy and cast doubt upon the prosecution which he seeks to carry on. This led to the exposures of which the defense now seeks to take advantage by these motions. It is a serious detriment to the prosecution and the reasons therefor are not yet plain.

■ The charge of unauthorized presence is based upon the fact that O'Gara was in the grand jury room. Counsel in open court admitted that they referred to no other person. If there had been claim or allegation that some other person besides an Assistant United States Attorney was present, the court would have felt bound to try the fact.[94] The argument above is convincing that O'Gara had a right to be in the grand jury room.[95] But, it is said, he was in the room at times when the grand jury was deliberating but not while they were voting. Of course, his presence while they were deliberating would be illegal, but the court is not going to take testimony of the grand jury upon the suggestion made.[96] This would not remove jurisdiction from the grand jury unless O'Gara was one who had no right to be there at all. If O'Gara was an unauthorized person in that sense, then the court would be bound to quash the indictment.

The cardinal point then is whether O'Gara was authorized.

■ The United States Attorney is given assistants whom he has designated in accordance with the statute to carry on his work.[97] Once appointed, these assistants can do anything which the United States Attorney can do.[98] The only

94. The cases where courts have quashed indictments owing to an unauthorized presence have been those where there was no authority to act or where the court held that the person was not a United States Attorney nor an Assistant nor one empowered by law to act for this official. See United States v. Heinze, C. C., 177 F. 770; United States v. Kilpatrick, D.C., 16 F. 765; United States v. Philadelphia Railway Co., D.C., 221 F. 683; United States v. Goldman, D.C., 28 F.2d 424. Here there is no question but that O'Gara was a duly appointed, qualified and acting Assistant United States Attorney.

95. The presence of a duly authorized Assistant United States Attorney in the grand jury room, for whatever purpose, is not objectionable when the grand jury is not deliberating or voting. Metzler v. United States, 9 Cir., 64 F.2d 203. See Rule 6(d), Federal Rules of Criminal Procedure.

96. In a case in the Northern District of California, it was held that "The mere presence of the district attorney when the voting takes place is at most an irregularity * * *." United States v. Terry, D.C., 39 F. 355, 361. In this case there is no charge that O'Gara was present during voting.

97. 28 U.S.C.A. § 502.

98. "It [the statute] places no restriction upon the powers of the assistant district attorneys. They come within the general rule that an assistant duly appointed to prosecute, is clothed with all the powers and privileges of the prosecuting attorney, and all acts done by him in that capacity must be regarded as done by

method of cutting off the power of an Assistant United States Attorney is by discharge.[99]

Furthermore, all the courts accept a person designated as an Assistant United States Attorney as the appropriate officer to conduct trials and other proceedings. If the designation is made by the appointment, the assistant can bind the United States by admission made in open court, even though contrary to the interests of the government' and directly contrary to the instructions of the United States Attorney. The court will not refuse to hear him in a case even though the court may believe him incompetent. So, when the grand jury is impaneled, an Assistant United States Attorney goes into the grand jury room. So far as the grand jury and the public are concerned, he is the United States Attorney. All accept him as such. He need not wear a uniform. He need not present to the grand jury authorization signed by the United States Attorney. He is an officer ·duly designated and acting by virtue of his appointment.[100] He has power to be present at any session of the grand jury and may talk to them freely inside ·or outside the grand jury room, except when the grand jury is deliberating or voting. His authority is not destroyed by any order of the United States Attorney that someone else conduct the proceedings ·or by any controversy in the office of the United States Attorney. It is true, as above noted,[101] the court has supervisory power over a grand jury and might instruct an Assistant United States Attorney not to go before that body. Even if the order were violated, it would not remove the authority and jurisdiction of the assistant, but would simply subject him to discipline if the order were well founded.

Thus we find O'Gara was duly designated to conduct the grand jury proceedings. He then had the power to go before' a grand jury and present any matter which they· were competent to hear. He had power to give them any documents and make any oral communications that he thought pertinent in the investigation of any crimes which the grand jury or he believed might have been committed in the Northern District of California. As Assistant United States Attorney, he had authority to advise the grand jury as to questions of law.[102] He might be subject to discipline by the court or the United States Attorney, but that circumstance does not prevent the grand jury from acting thereon.

Undue insistence of an Assistant United States Attorney, which coerced the grand jury to bring in an indictment, has also been urged. It must be remembered that one of the criticisms of the grand jury system is that a grand jury is too' often a rubber stamp for a prosecutor.[103] However, as to these grand juries, which showed independence to such a point that they and their members have been denounced in unmeasured terms, such criticism cannot be taken as valid.

The indictments which are before the court are signed by the name of the United

the prosecuting attorney himself." Brown v. United States, 9 Cir., 257 F. 703, 705.

99. 28 U.S.C.A. § 504.

100. "The presentation of cases to the grand jury is part of the routine work of a prosecuting attorney's office. It is frequently done, both in the federal and in the state courts, by the assistants. To say that an assistant cannot appear before the grand jury, unless he has been ·designated by the Attorney General to do so in each particular case, seems to me unnecessarily narrow and technical." United States v. Martins, D.C., 288 F. 991, 992.

101. See Note 40.

102. United States v. Brumfield, D.C., 85 F.Supp. 696; United States v. Cobban, . C.C., 127 F. 713; United States v. American Medical Association, D.C., 26 F.Supp. 429.

Even if he had not been a United States Attorney, he might still have been permitted, if asked, to advise them. In England a judge told a grand jury that it was not necessary for them to come to him for advice.

"* * * for I saw among them an old friend, one of His Majesty's Counsel, and I knew his capacity to advise them * * *." MacKinnon, 149.

103. Orfield, Criminal Procedure from Arrest to Appeal, 180.

States Attorney, by a duly authorized and appointed Assistant United States Attorney. The court cannot assume that the indictments are unauthorized by the Attorney General, the United States Attorney and the Assistant United States Attorney who signs them. Any Assistant United States Attorney who appeared before the grand jury had authority to act at least de facto,[104] and the court will not examine the qualifications of any of them so acting. So far as conspiracies of the United States Attorney and the grand jurors are concerned, all were acting under official oaths and no such condition is possible. Nor, under these circumstances, is an abuse of process conceivable. Even if each violated his oath, this is of no legal concern to a defendant.

If the United States Attorney were displeased with his assistants in proposing to sign his name to this indictment or in signing his name by them or in conducting proceedings before the grand jury or calling witnesses, he had a remedy. He could have had them discharged or removed any or all, and thereafter none of them would have had authority under the statutes to proceed.[105] As superior, he cannot escape responsibility for the acts of each and every one of them.

But, so long as they acted in an official capacity with his consent, the grand jury, the court and everyone else are bound by law to accept the action as that of the Attorney General and the United States Attorney. By going forward, he ratifies the action of his assistants and each of them. The action, by whomever taken, was the action of the Attorney General and the United States Attorney.

■■■ The sixth cause of complaint above noted, concerning action by an Assistant United States Attorney, relates to McMillan. It is said that his examination of defendants Smyth and Cosgrove as to their testimony relieved each from prosecution under the guarantees of the Fifth Amendment. It is not shown that either defendant objected. If the rule were as stated, a United States Attorney could grant immunity to a criminal simply by calling him as a witness. For many years, the overwhelming weight of authority has held that the privilege against self crimination is a personal one and must be claimed and stood upon in order to be effective. United States v. Johnson, D.C., 76 F.Supp. 538; Kaplan v. United States, 2 Cir., 7 F.2d 594, 597. But counsel claims that the statute [106] prohibits the use of the testimony taken before a congressional committee.[107] This doctrine is limited to use in court.[108] Use before a grand jury is not included. Here apparently the testimony before the committee was simply used as a guide. This point is unrelated to the other complaints.

■■■ The presentation upon the last few pages shows no valid criticism has been

104. See Note 100.

105. 28 U.S.C.A. § 504.

106. 18 U.S.C.A. § 3486.

107. United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376, is of no help to defendants here. It is concerned with the necessity of making a claim of immunity under the particular statute there involved.

108. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, though dealing with § 3486, is likewise inapplicable since it relates to the use of such testimony as evidence in court before a petit jury.

Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, concerning a refusal to answer questions propounded by a grand jury on the ground of self-incrimination, held that R.S. § 860, a statute almost identical with R.S. § 859, 18 U.S.C.A. § 3486, was not a sufficient substitute for the constitutional privilege of refusing to answer self-incriminating questions. In the words of Chief Justice Vinson, United States v. Bryan, 339 U.S. 323, 336, 70 S.Ct. 724, 733, the Counselman decision stands for the proposition that "a witness who is offered only the partial protection of a statute such as §§ 859 and 860—that his testimony may not be used against him in subsequent criminal proceedings—rather than complete immunity from prosecution for any act concerning which he testifies may claim his privilege and remain silent with impunity." It in no wise purports to abolish use of the results of congressional committee proceedings as a source of grand jury information.

made of any action of an Assistant United States Attorney being unauthorized. But in any event, where an indictment has been returned by a grand jury with the advice of an Assistant United States Attorney, the court cannot dismiss upon the ground that by them there was an abuse of power. This proposition is conclusively settled by United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333. There the facts were as follows:

"The Comptroller of the Currency, in January, 1915, closed the doors of the First National Bank of Uniontown, Pennsylvania. At the opening of the November term, 1915, of the court below, sitting at Pittsburgh, the attention of the grand jury was called by the court to alleged criminal acts connected with the administration of the affairs of the bank, and, following an investigation, the district attorney submitted to the grand jury a proposed indictment charging Thompson, the president of the bank, in 47 counts with violations of the National Bank Act. The grand jury having concluded to indict only for the first 17 of said counts, the district attorney prepared an indictment embracing them and withdrew the other 30 from consideration. The bill thus drawn was submitted to the grand jury, by it presented as a true bill, and was ordered filed.

"On March 17, 1916, the Attorney General of the United States, pursuant to the Act of June 30, 1906 (34 Stat. 816 [Comp. St. § 534, 5 U.S.C.A. § 310]), appointed a special assistant for the purpose of cooperating with the district attorney in the matter of the steps to be taken to procure the indictment of Thompson. The next session of the court was held in March, 1916, at Erie, and the district attorney and the assistant to the Attorney General, without asking authority of the court, directed the attention of the grand jury to the charges against Thompson covered by the

counts as to which the grand jury at Pittsburgh had failed to make a presentment, and after hearing witnesses called by the district attorney, the Erie grand jury on the 24th day of March, found a true bill containing 30 counts covering such charges. When this indictment was present the court expressed doubt, in view of the fact that the charges had been submitted to a previous grand jury and no presentment had been made, whether there was any authority in the Erie grand jury, at the instance of the district attorney, to consider such charges without previously obtaining the consent of the court." 251 U.S. at pages 408–409, 40 S.Ct. at page 290.

Upon appeal from a ruling by the trial court sustaining defendant's motion to quash the Erie indictment,[109] the Supreme Court, holding a lack of power in the trial court to quash the indictment on these grounds, reversed and lucidly delineated the province of the grand jury and the United States Attorney, 251 U.S. on pages 413 and 414, 40 S.Ct. at page 292:

"(1) That the power and duty of the grand jury to investigate is original and complete, susceptible of being exercised upon its own motion and upon such knowledge as it may derive from any source which it may deem proper, and is not therefore dependent for its exertion upon the approval or disapproval of the court; that this power is continuous and is therefore not exhausted or limited by adverse action taken by a grand jury or by its failure to act, and hence may thereafter be exerted as to the same instances by the same or a subsequent grand jury.

"(2) That the United States district attorney, in virtue of his official duty and to the extent that criminal charges are susceptible of being preferred by information, has the power to present such informations without the previous approval

109. The defense moved to quash the indictment on the grounds that the subject matter of the indictment (1) had not been submitted to the grand jury by the court, (2) had not been considered by the grand jury of its own motion, (3) was submitted by the United States Attorney without permission of the court, (4) was not derived from the personal knowledge of any grand juror nor from the testimony of any witnesses appearing before the grand jury by order of the court, (5) was derived solely from the testimony of witnesses called by the United States Attorney without permission of the court.

of the court; and that by the same token the duty of the district attorney to direct the attention of a grand jury to crimes which he thinks have been committed is coterminous with the authority of the grand jury to entertain such charges."

So far as the defendants are concerned, they are charged, respectively, with crime. None of them has any right to insist that the grand jury be specially authorized.[110] None of them has any interest in whether the United States Attorney authorized the prosecution. They have had the constitutional guaranty carried out to the full. Each has been presented and indicted by a duly constituted grand jury. Each is now entitled to a fair trial before an impartial judge and jury.

As was well said by Judge Learned Hand, in commenting upon a similar situation: "Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the minds of any one of the twelve. Why in addition he should in advance have the whole evidence against him to pick over at his leisure, and make his defense, fairly or foully, I have never been able to see. No doubt grand juries err and indictments are calamities to honest men, but we must work with human beings and we can correct such errors only at too large a price. Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime." United States v. Garsson, D.C., 291 F. 646, 649.

The court refuses to inspect the record or hear testimony on the issues presented. The court finds that the specifications of

the motion to dismiss are insufficient as a matter of law, whether in the original form or as amended or clarified on oral argument or as supplemented by the suppressed affidavits. The court denies these phases of the motions to dismiss.

---

110. Rule 6, Federal Rules of Criminal Procedure, provides for "one or more grand juries" for one court at the same time. The court may direct their attention to a particular field of investigation, but each has equal authority and is subject to no limitations as to what matters may be considered.