141 So.2d 749 (1962)
IN THE MATTER OF ALEX CLEMMONS ET AL., MEMBERS OF THE EMPANELED GRAND JURY FOR THE 1961 SPRING TERM OF CIRCUIT COURT, IN AND FOR OKALOOSA COUNTY, FLORIDA, APPELLANTS,
v.
STATE OF FLORIDA AND THE FIRST JUDICIAL CIRCUIT COURT OF FLORIDA IN AND FOR OKALOOSA COUNTY, FLORIDA, APPELLEES.
No. C-490.
District Court of Appeal of Florida, First District.
April 26, 1962.
Rehearing Denied May 15, 1962.
*751 Gillis E. Powell, Crestview and A.G. Campbell, Jr., De Funiak Springs, for appellants.
Richard W. Ervin, Atty. Gen., and Reeves Bowen, Asst. Atty. Gen., for appellee.
RAWLS, Judge.
Appellants, as individual members of the Grand Jury duly empaneled for service at the 1961 Spring Term of the Circuit Court in and for Okaloosa County, Florida, have appealed from a judgment purging from the official records of the court a designated paragraph contained in an interim report filed by them, and adjudging each of the members of the Jury guilty of criminal contempt.
At the commencement of the Spring Term of the Circuit Court in Okaloosa County, Honorable Ernest E. Mason, one of the Circuit Judges of the First Judicial Circuit of Florida, duly empaneled a Grand Jury for service during that term. In his charge to the Jury Judge Mason said:
"You are not limited to investigations of supposed or real violations of our criminal laws. It is your privilege and duty to examine into the workings of your county and municipal officials, the conduct of the county's business and the business of municipalities, and the general conditions prevailing in the county and municipalities with regard to law enforcement and the orderly and efficient administration of the county and city governments."
After deliberation the Grand Jury filed an interim report which, among other things, contained the following paragraph:
"Inasmuch as one other matter was brought to our attention we feel that we must comment on same. Where suspicion is cast upon the impartiality of our Court system, whether it be founded or unfounded, the confidence of the public is lessened in some degree. So that our Courts remain above even the slightest hint of suspicion, and so that the public confidence in our Courts remain unshaken in the slightest degree, we recommend that attorneys and/or firms closely associated by blood or marriage to any member of the judiciary refrain from practicing before his kin, and thereby relieve any party so related from any hint of partiality in the judicial process.
"We respectfully request your Honor to allow us to recess until some future date."
While the Grand Jury was in recess subject to recall upon order of the assigned judge, the resident Circuit Judge of Okaloosa County, Honorable Charles A. Wade, caused to be issued a summons to each member of the Grand Jury requiring that they appear in open court at an hour and date fixed in the summons. Upon the reconvening of the Jury Judge Wade read to the members so assembled the above quoted paragraph of their interim report, and without further proceedings summarily pronounced judgment from the bench as follows:
"You and each of you are hereby held in contempt of the Court, but sentence *752 is withheld on grounds that the State Attorney was a new one, had he not been this paragraph would not have been entered. It is hereby ordered that Paragraph VI of the Grand Jury Report be purged from the records and purged from any further use as records in the future."
There is filed in the record before us a stipulation entered into by counsel representing the Grand Jury and the Attorney General of Florida, in which it is agreed that the Honorable Charles A. Wade is the resident Circuit Judge of Okaloosa County; that he is the nephew of Honorable Purl G. Adams, a member of a law firm located in Crestview, Okaloosa County, which attorney and members of his firm are counsel in cases pending in the circuit court of the county; that it is well known throughout the county that Attorney Adams is the uncle of Judge Wade.
Although not raised by either party in this proceeding, the critical query that immediately poses itself is the power of the court to cite an entire grand jury for contempt by reason of the contents of its report duly compiled during its deliberations. A determination of this question is not only essential to the disposition of this cause, but failure to do so may result in this opinion being cited as solemn authority for the proposition that courts have the power to hold a duly empaneled grand jury of law-abiding citizens of approved integrity and good character for contempt and jailing them for including in their report something that might strike a judge as tending toward an interference with the proper administration of justice or discrediting the authority or dignity of the court. The courts have no such power in this jurisdiction.
The grand jury is a common law institution.[1] In the reign of Edward III, the Sheriff returned a panel of twenty-four knights to inquire at large for the county, and this body was termed "le graunde inquest".[2] During this period, the grand jury was an arm of the crown, acting as a public prosecutor for the purpose of ferreting out all crimes, with the members of the inquest being at all times bound to inform the court either singly or collectively their reasons for arriving at their verdict and the evidence upon which it was based. "The seed, however, had been sown in Bracton's time, which was destined to change the grand jury from a mere instrument of the crown to a strong independent power which stood steadfast between the crown and the people in the defence of the liberty of the citizen."[3] (Emphasis supplied.) In 1681, upon the famous proceedings against the Earl of Shaftesbury, Lord Chief Justice Pemberton strove to influence a grand jury with this threat: "Let me tell you," said he, "if any of you shall be refractory, and will not find any bill where there is probably ground for an accusation, you do therein undertake to intercept justice and make yourselves criminals and guilty, and the fruit will lie at your door." This threat did not prevail. The conduct of the grand jury upon this occasion is one of the finest illustrations of fearless independence in history.[4] The finding was ignoramus.[5] Although the crown, through the courts, endeavored to compel grand juries to do their will on at least one occasion subsequent to the Earl of Shaftesbury case, by imposing fine or imprisonment,[6] there is no question that the common law as it existed at the time of the adoption of our Constitution, recognized that the grand jury was absolutely free from the control of the court in its findings.[7]
*753 In England when conflicts arose in defining the powers of the king and the rights of his subjects, the grand jury acted as a stopgap to prevent persecution of the subjects by the stooges of the king. Conflicts between the citizen and the government have been rare in this country, but the grand jury was integrated in our system of law for purposes not materially different from those for which it was employed in England.[8]
Proceeding then to the consideration of any change of the common law by this State, we find the grand jury, as recognized in two different sections of our Constitution,[9] is as much a part of the rights secured to the citizens of the state, as any other portion thereof, including the provisions for courts. This institution bears a place within our governmental structure and our system of justice on an equal footing with the courts. It has been variously referred to as a coordinate branch of the judiciary, and as an arm, appendage, or adjunct of the circuit court.[10] It is of the people and for the people; they have preserved it in their constitution. It is one of the means provided for the people to participate in popular government and its primary function is to preserve personal and property rights.[11]
Mr. Justice Terrell, who has authored opinions on the subject reflecting vital concern for the preservation of grand juries as the people's forum in our judicial system, stated in Ryon v. Shaw:[12] "We specifically held in the last cited case[13] that if the employees or officers are incompetent or lax in the performance of the duty imposed on them, if they are lacking in the common courtesy attached to the duty vested in them, whatever the delinquency may be, the Grand Jury has a right to investigate and make a fair report of its findings. * * *" And In Re Report of Grand Jury, supra, Mr. Justice Terrell again speaking for the court stated: "The holder of public office in this country is clothed with a limited degree of sovereignty; in other words an attribute inherent in the people is transferred to one of its citizens to be exercised according to the terms of the trust imposing it and not as he would a chattel or a business that he acquires by outright purchase. Both the office and the conduct of the holder are public property that may be withdrawn at any time the trust vesting it is abused. In a democracy, it is not possible for the people individually to know when such trusts are being abused so one of the agencies provided to represent and report when abuses are committed is the grand jury. It is a means whereby the people participate directly in the administration of their business and aids to a knowledge of why the grand jury has become such an important agency among free peoples. It could never attain such an important status in the totalitarian state."
A judge is a public office holder. His conduct is public property. The courts administer the people's business. A grand jury is presumed to be empaneled of qualified law-abiding citizens of sound judgment and they are called upon to discharge grave *754 and responsible functions.[14] It is the guardian of all that is comprehended in the police power of the state.[15] It is subject to the direction of the court as to being empaneled and discharged; however, within their own room they are supreme in their action. To hold that the contents of a grand jury's report may subject the panel thereof to fines or imprisonment by any one of the numerous judges we find in the various sections of this State, is to emasculate the voice of the people within our judicial system. How could such a body remain independent and report its deliberations if it had to labor under the awesome threat of the sword of Damocles, i.e., contempt, for each statement contained in such a report? Why should any judge be immune to criticism by a duly empaneled grand jury, and at the same instance every nonjudicial officeholder of this state be subject to a scrutiny of the conduct of his office by a grand jury? By what divine right can the judiciary remove itself from this lawfully constituted forum of the people?
We are not unmindful of the argument that judges, by the nature of their duties, should remove themselves from the "rough and tumble" atmosphere of political life. However, we are cognizant of the fact that our highest court has held in numerous cases that judges not only have the right, but the duty, to expunge objectionable matter from a grand jury's report which is not germane to the proper orbit of their inquiry.[16] In the history of the jurisprudence of this State, no judge of any court has prior to the instant cause seen fit to endow himself with such power as has been attempted to be exercised here.
Appellee insists that Coons v. State[17] stands as authority for sustaining the action of the circuit judge in the instant cause. That cause involved the actions of a grand jury empaneled under the laws of the State of Indiana and the decision therein clearly states: "The duties of the grand jury in this state are governed by statute, and it has no rights or privileges based upon the common law." (Emphasis supplied.) Appellee emphasizes that the Florida Supreme Court cited the Coons case with approval in State ex rel. Brautigam v. Interim Report of Grand Jury[18] and, therefore, adopted the doctrine of same. A statement is made in the Brautigam case to the effect that the action of the grand jury was contemptuous as to the judge; however, the holding of an entire grand jury panel in contempt was not an issue considered by the Supreme Court in that cause. In fact, it is most significant, considering the contents of the grand jury's report in the Brautigam case, that the court attacked did not attempt to exercise a power of contempt over the panel. Clearly, the Coons case establishes no precedent as to the exercising of the power of contempt in a jurisdiction, such as ours, that has long recognized the independence of a grand jury by constitutional provisions and by common law. From a review of innumerable cases concerning the actions of so-called "run-away grand juries" it is apparent that the courts of the several states have had ample provocation for attempting to exercise the power of contempt over an entire grand jury panel; however, in no other instance in the entire jurisprudence of the several states have we found that any court has attempted to exercise such a power; the holding in every such case *755 has been that the power that the respective courts possess is that of expunging scandalous and immaterial matter from the report of a grand jury. Therefore, it is apparent that the Supreme Court has not recognized such a doctrine as enunciated in the Coons case.
That a judge has the right and authority to maintain the dignity of the courts by utilizing the weapon of contempt is so imbedded in the common law and the case law of this jurisdiction, that citations in support of this authority would be superfluous. It is equally clear that he has such authority insofar as it pertains to the actions of the individual members of the grand jury for gross misconduct.[19]
What about the common law and constitutional rights of the members of the grand jury? Our laws provide that only the names of law-abiding citizens of approved integrity and good character shall be placed in the jury box.[20] It is to be presumed that these citizens are pursuing their law-abiding daily habits when they are subpoenaed for grand jury duty and are, in all probability, making a personal and financial sacrifice to so serve their sovereign. After deliberating in the secrecy of their room and upon making their report, are they to be summarily made to appear before any one of numerous judges and account for the contents of said report? This jurisdiction has said that the assigned judge may receive the report and suppress or expunge portions thereof not within the grand jury's province, prior to the results of their secret deliberations being made public. Is this not enough protection for the courts? This is far more protection than any other office holder possesses, for he must look to the courts for his protection. Surely the courts can and will protect themselves.
It is our conclusion that the common law, the Constitution and the statutes of the State of Florida, and the decisions of our highest court are repugnant to the concept of courts in this jurisdiction possessing the power of holding an entire grand jury panel in contempt by reason of contents of such panel's report reached by them in their deliberations; and that logic and common sense show no necessity for the courts to bestow this power upon themselves in order to protect their dignity or the orderly administration of justice.
The foregoing is not to be interpreted as authority for the proposition that the rights and duties of a grand jury are not without limitations. As repeatedly held by the Supreme Court, a grand jury will not be permitted to single out persons in civil or official position to impugn their motives, or by word, imputation or innuendo hold them to scorn or criticism. The grand jury will not be permitted to become the tool of blocs and groups to pry into personal affairs and to oppress others. Neither will they be permitted to speak of the general qualifications or moral fitness of one to hold an office or position. This is so, even though the question of whether a county office is being conducted according to law and good morals is at all times within the jurisdiction of the grand jury to investigate. It is likewise improper for a grand jury to present with word of censure and reprobation a public official or other person by name without presenting him for indictment. While salutary results may flow from a grand jury's calling attention to conditions which they find to be in need of remedy, when the report goes further and impugns the motives and conduct of public officials, the possibility of damaging the reputation of blameless public officials overshadows the good which might inure to the public from the filing of such a report. If a grand jury exceeds permissible limits, the assigned judge has the right to expunge the objectionable matter from the report in the exercise of its inherent *756 power to preserve the integrity of its records, or to correct the action of one of its appendages where such action constitutes a violation of court rules or is in excess of its powers.[21]
The next question to be considered is whether Judge Wade erred in expunging from the Grand Jury's report the contested matter set out above. Consequently, we must determine whether it can be said that the expunged matter offended the dignity and authority of the Circuit Court of Okaloosa County.
Implicit in the report is a finding by the grand jury that a condition exists in the county which, if improperly exploited, might adversely affect the impartial administration of justice by the courts of that locality. The report does not single out any particular court to which reference is made, nor does it refer to any particular individual serving in a judicial capacity in the court system of the county. The report concedes that as of the date of its filing, the courts of Okaloosa County were above the slightest hint of suspicion and had the public confidence. It was apparently for the purpose of maintaining the impartiality of the courts and preserving public confidence in their administration that the recommendation contained in the report was made.
The principal thrust of the report is a recommendation directed specifically to attorneys who are related by blood or marriage to members of the judiciary. No individual attorney or law firm is named either specifically or by implication. The apparent purpose of the recommendation is to relieve members of the judiciary from the embarrassing situation of either having to disqualify themselves in cases where one of the parties is represented by counsel closely related to the judge, or else have his impartiality questioned in the event rulings are made which are favorable to that side of the case represented by the judge's relative. It is difficult to perceive how a grand jury's action calculated to protect the impartiality of the court system of a county against hint of suspicion could be considered offensive. The recommendation constitutes nothing more than an attempt to preserve the same climate of judicial impartiality which every member of the judiciary voluntarily undertakes to maintain when he assumes the duties of his office. The action of every judge is, among other things, guided by Canon 13 of the Canons of Ethics governing judges, 31 F.S.A. which is as follows:
"A judge should not act in a controversy where a near relative is a party; he should not suffer his conduct to justify the impression that any person can improperly influence him or unduly enjoy his favor or that he is affected by the kinship, rank, position or influence of any party or other person."
The spirit of this judicial canon, and its importance in the administration of justice, was captured by Judge Arthur T. Vanderbilt, when he wrote:
"In the eight centuries or more in which the judicial office has evolved in the Anglo-American system of law, three essentials stand out in any definition of a true judge. These are impartiality, independence and immunity. Of these impartiality is the most important; independence and immunity are the means of achieving impartiality. Judges should be free from every tie which may sway their judgment. They should be answerable to no one and immune from liability for judicial acts, to the end that justice may be administered without favor."[22]
It is our objective appraisal of the report that neither directly nor by inference does it reflect adversly upon the dignity *757 or authority of Judge Wade, nor of the court over which he presides. There is nothing in the report to indicate a criticism of Judge Wade for having conducted litigation pending before him in any manner except upon the highest plane of judicial impartiality. Any contrary inference or innuendo would do violence to the plain language employed by the drafters of the report. We, therefore, hold that Judge Wade misinterpreted the report in question and misapprehended its legal effect when he found that it was contemptuous per se.
We have carefully considered the remaining points on appeal but are of the opinion that it is unnecessary to resolve the questions presented thereby in view of our disposition of the principal issues.
The judgment appealed is accordingly reversed and the cause remanded with directions that the judgment of contempt entered against appellants be set aside and held for naught, and the questioned report of the Grand Jury be reinstated as an official record of the court.
WIGGINTON, Acting C.J., concurring in part and dissenting in part.
STURGIS, J., concurring specially.
WIGGINTON, Acting Chief Judge (concurring in part, dissenting in part).
I concur in that part of the majority opinion addressed to the merits of this appeal as outlined by the points for decision contained in the briefs of the respective parties. I refer to the holding that the report which formed the basis of the judgment appealed was not contemptuous per se, and that the trial judge erred in adjudging the members of the grand jury to be in contempt of court and expunging the report from the official records.
I do not share the view of the majority that under the laws of Florida a grand jury's report is absolutely privileged. Nor can I agree that under the law of this state a circuit judge has no power or authority to adjudge a grand jury in contempt for misconduct in the performance of its official duties if the act in question exceeds the grand jury's lawful authority and has the effect of impeding the orderly administration of justice, or is inimicable to the dignity and authority of the court.
The majority opinion appears to be predicated upon the erroneous assumption that a grand jury is something separate and apart from the court, and is over and beyond the law which applies to all others. It is established in all jurisdictions of this country that a grand jury is an arm or agency of the court by which it is appointed. The grand jurors are officers of the court in exactly the same manner as is the petit jury, the sheriff and clerk, the prosecuting attorney, the bailiffs and the reporters. There is no support in law for the proposition that a grand jury is an independent planet divorced from the court.[1] Stated differently, a grand jury is a part of the court machinery, an all important element in the agency of government endowed with judicial power. It is under control by the court to the extent that it is organized and the legality of its proceedings determined by the court in accordance with law.[2] It is generally held that the members of a grand jury are subject to the supervision and control of the court for any violation of their duties, and are liable for punishment both at common law and under statute for various violations of the duties of their office.[3] As said by the Supreme Court of Indiana, "Under *758 the growth of the grand jury system in England at one time it was considered a great protection against the oppression of the Crown. Today it should still continue a great protection for the individual citizen against improper prosecution. It should never be permitted to become an engine of oppression or an instrument of defamation."[4]
Cases are legion in which individual members of a grand jury have been punished through contempt proceedings for failure to properly perform their duties, and for conduct disrespectful of the court or which impedes the orderly administration of justice. No logical reason can be advanced why the entire membership of a grand jury acting in concert is not subject to the same rule of law which authorizes the imposition of a penalty upon any one member thereof had the offending act been committed by him alone.
In their authoritative treatise on The Conduct of Juries, Thompson and Merriam say, "The power resides in the court to inquire whether the grand jury have performed their duty, or whether they have exceeded their powers. The court may fill vacancies in the panel, may punish the grand jurors as a body, or individually, for contempt and violation of duty."[5]
The landmark decision in this country dealing with the authority of a circuit court to adjudge a grand jury guilty of contempt is Coons v. State, rendered by the Supreme Court of Indiana. In Coons a duly empaneled grand jury filed a report containing derogatory, scurrilous and defamatory statements directed at the presiding judge of the court. Upon proper proceedings the entire grand jury was adjudged in contempt of court and each individual member was punished by fine. On appeal the judgment of contempt was affirmed. In its opinion the Supreme Court pointed out that the grand jury exceeded its authority in making a report which in effect charged the presiding judge with a criminal offense without at the same time indicting him for such offense. The court found that it is not privileged, absolute or qualified, to commit contempt of court. The court held that a grand jury report is contemptuous if it uses libelous, undignified and scurrilous language which brings the court into disrepute and lowers its dignity whereby the due administration of justice is hindered and prevented. It said that the open insult to the person of the judge while presiding is a direct contempt of court, in support of which it may be said that courts of record of general jurisdiction always have power to punish as for contempt their officers for offending the dignity of the court.[6]
The Coons case discussed above was cited with approval by the Supreme Court of Florida in the case of State ex rel. Brautigam v. Interim Report of Grand Jury.[7] In Brautigam the Supreme Court was considering the validity of an order refusing to expunge from the record of the circuit court of Dade County a grand jury report which made scurrilous and defamatory statements against one of the circuit judges of that court. In the course of its opinion the court stated the ultimate question for its decision to be whether a grand jury may investigate the official conduct of a judge of the court of which it is an arm, and file a report of its investigation which is openly and frankly contemptuous as to the judge, without at the same time filing indictment against him. The Supreme Court concluded that such a report goes far beyond any authority which by judicial decision, has been conferred upon grand *759 juries in this state. In support of its announced conclusion the Supreme Court cited with approval the Coons case hereinabove discussed. It is inconceivable to me that the Florida Supreme Court would have relied upon the decision in Coons as the predicate for its conclusion on the ultimate question before it for decision unless it recognized Coons as authority for the proposition that a grand jury in Florida is subject to the ultimate control of the court, and may be punished by contempt for filing the type of report considered in the Brautigam case. If the Supreme Court had agreed with the majority opinion filed herein that a grand jury is immune from punishment for filing a scurrilous report attacking the integrity of the court, it does not seem logical to me that the Supreme Court would have cited or relied upon Coons in support of its decision in Brautigam. I therefore interpret the Brautigam decision as establishing the rule of law in Florida that a grand jury is not immune from punishment by contempt proceedings if it files a report containing scurrilous or defamatory statements regarding a judge of the court in which the grand jury is serving, without at the same time rendering an indictment against the judge who is the subject of criticism in its report.
Except for the inherent power to punish for contempt a grand jury which files a report attacking the character or integrity of the judge in whose court the grand jury is serving, the judge is completely defenseless and without remedy either to protect his good name against the irresponsible action of a grand jury, or to preserve the dignity and authority of the court over which he presides. To say as does the majority opinion that his only recourse is to expunge the report from the record is no answer to the problem. The damage which such a report will do to the good name, reputation and professional standing of a judge, as well as to the entire judicial branch of government, is irreparable.
If the judge is guilty of any act which constitutes an offense against the laws of the state, it is not only the prerogative but the duty of the grand jury to indict him. In this event the judge is afforded the same opportunity as any other citizen to appear in a court of law before a jury of his peers and clear his name of the stigma arising from the charge placed against him. If convicted, his confinement in prison will vindicate the grand jury's action and remove him from further authority as a judicial officer of the state. If his acts are not such as constitute an offense against the criminal laws of the state, but would amount to misfeasance, malfeasance, or nonfeasance in office, the interest of the public may be protected by recourse to the procedure for impeachment as outlined in the Constitution of this state. If the judge's conduct is such as will not warrant either an indictment or impeachment, the public still have its remedy by removing him from public office at the next election.
Aside from the wrong which a scurrilous and defamatory grand jury report will inflict upon the judge as an individual, there are more compelling reasons of public policy why such a report exceeds the lawful power and authority of the grand jury for which the members thereof may be punished. All thinking persons know that every attack made upon a judicial officer, regardless of how unfounded and without merit it may be, tends to destroy public confidence in and respect for all courts. If, as held by the majority opinion, grand juries may with impunity file reports having the inevitable effect of bringing courts into disrepute and engendering distrust of and disrespect for the governmental machinery designed to administer justice, the effect of such practice will ultimately result in the destruction of the entire judicial system as an institution of government. The inconsequential benefit to the public that might flow from a grand jury report which ridicules and defames the judge of a duly constituted court can in no manner compensate for the destructive effect such a report will have upon the ability of our judicial system to properly discharge its lawful function. *760 Courts have traditionally stood as bulwarks between the lawful rights of individual citizens on the one hand, and the abuse of governmental power on the other. If the judicial system as now constituted is undermined and eventually destroyed by the actions of irresponsible grand juries, the courts will degenerate to nothing more than rubber stamps subservient to the will of the executive branch of government. In the event such comes to pass, the lives of our citizens will be ruled under a system of executive tyranny similar to that which now prevails in Russia, China, Cuba and other totalitarian countries where courts no longer constitute an independent branch of government and whose very existence is but a mockery and a sham.
STURGIS, Judge (concurring specially).
Being of the view that the opinion of RAWLS, J., correctly interprets the power and position of the grand jury system as it exists in Florida, I concur therewith.
While the grand jury report in question does not with exactitude designate Judge Wade as the object of its admonition, it will be noted that a stipulation was filed herein to the effect that it is well known in Okaloosa County that he is a nephew of Purl G. Adams, Esq., a lawyer who maintains his law office at Crestview, the county seat of said county, and that Mr. Adams and members of his law firm appear as counsel of record in litigated cases pending in the Circuit Court of Okaloosa County over which Judge Wade, the resident judge, usually presides. The stipulation bridges the gap of any question as to whom the report of the grand jury was directed and I think that Judge Wade was justified in concluding, as his action indicates, that the grand jury had him in mind, that it intended to "put the shoe on his foot" and he found that it fit. The fact that the grand jury failed to call him by name is beside the point.
If the report had specifically named and declared him to be in violation of the canons of ethics for failing, of his own motion, to recuse himself from presiding over litigation in which his uncle appeared as counsel, the report would nevertheless have been insufficient to support the peremptory judgment holding the entire membership of the grand jury in contempt. I am much impelled to that view by the fact that failure of a judge to disqualify himself under such circumstances does not constitute a crime under the laws of this state and, at most, is only a violation of the code of judicial ethics. I am not unmindful of the fact that he may be disqualified at the instance of a party to such litigation, but I know that lawyers have to live with their judges and that situation can become quite difficult, if not intolerable, where a judge is known to look askance upon a lawyer who puts to the test his right to preside. Considering the history of impeachment proceedings, it is trite to rely on that cure for such an evil. And while I am a firm believer in the elective process for selection of judges and their continuance in office, I hardly think it a practical remedy to wait the event of rejection at the polls. Finally, I have no worry about this nation falling into the ways of "Russia, China and Cuba" or even being caused to limp in that direction by the impact of the decision in this case. On the contrary, I am inclined to the notion that the vesting of autocratic power in any official leans more to the concept of government adhered to by those nations.
NOTES
[1] Cotton v. State, 85 Fla. 197, 95 So. 668 (1923).
[2] King v. Fitch, Cro.Chas. 414.
[3] Edwards, The Grand Jury, p. 27. See also Britton (Legal Classic Series) 18.
[4] Thompson & Merriam on Juries, p. 653.
[5] Ignoramus, "We ignore it" was used during this period in the same connotation as the English phrase "Not a true bill".
[6] King v. Windham, 2 Keble 180.
[7] King v. Baker, Rowe's Rep. of Interesting Cases, p. 603.
[8] Sullivan v. Leatherman, 48 So.2d 836 (Fla. 1950); Sawyer v. State, 94 Fla. 60, 113 So. 736 (1927).
[9] Constitution of the State of Florida, Declaration of Rights, Section 10; Article V, Sec. 9, F.S.A.
[10] 15 Fla.Jur., Grand Jury, § 2, Citing Cherry v. State, 6 Fla. 679 (1856); Craft v. State, 42 Fla. 567, 29 So. 418 (1900); Skipper v. Schumacher, 124 Fla. 384, 169 So. 58 (1936).
[11] In Re Report of Grand Jury, 152 Fla. 154, 11 So.2d 316 (1943).
[12] Ryon v. Shaw, (Fla. 1955) 77 So.2d 455, 457, 48 A.L.R.2d 713, which also held that grand juries are arms of the court, and in performance of the duty imposed on them, they are privileged to publish false and defamatory matter if any of it has some relation to the cause in which they are acting as a jury.
[13] Owens v. State, 59 So.2d 254 (Fla. 1952).
[14] Skipper v. Schumacher, 124 Fla. 384, 169 So. 58, 64 (1936).
[15] In Re Report of Grand Jury, 11 So.2d p. 318, Footnote 11; Owens v. State, Footnote 13.
[16] State ex rel. Brautigam v. Interim Report of Grand Jury, 93 So.2d 99 (Fla. 1957).
[17] Coons v. State, 191 Ind. 580, 134 N.E. 194, 20 A.L.R. 900.
[18] State ex rel. Brautigam v. Interim Report of Grand Jury, Footnote 16.
[19] Skipper v. Schumacher, 169 So. p. 64, Footnote 14.
[20] Ibid.
[21] State ex rel. Brautigam v. Interim Report of Grand Jury, Footnote 16; In Re Report of Grand Jury, Footnote 11.
[22] Judges and Jurors by Chief Justice Arthur T. Vanderbilt (Boston University Press, 1956).
[1] United States v. Smyth, (D.C.N.D.Cal. 1952) 104 F. Supp. 283, 291.
[2] Application of Texas Co. et al. (D.C.Ill. 1939) 27 F. Supp. 847, 850.
[3] 38 C.J.S., Grand Juries § 45, p. 1065; 24 Am.Jur., Grand Jury, p. 859, § 36.
[4] State ex rel. Reichert v. Youngblood, (1947) 225 Ind. 129, 73 N.E.2d 174, 179.
[5] Conduct of Juries by Thompson and Merriam, p. 652, § 596; Turk v. State, 7 Ohio (Pt. II.), 240, 243; State v. Cowan, 1 Head. 280.
[6] Coons v. State, (1922), 191 Ind. 580, 134 N.E. 194, 20 A.L.R. 900.
[7] State ex rel. Brautigam v. Interim Report of Grand Jury, (Fla. 1957) 93 So.2d 99.